David **GREENHAW**, on behalf of himself and all others similarly situated, Plaintiff-Appellee Cross-Appellant,

v.

**LUBBOCK COUNTY BEVERAGE ASSOCIATION, et al., Defendants,**

**Cecil's, Inc., et al., Defendants-Appellants Cross-Appellees.**

No. 82-1356.

United States Court of Appeals, Fifth Circuit.

Dec. 27, 1983.

Rehearing and Rehearing En Banc Denied Feb. 17, 1984.

---

**5.** *See* note 2, *supra.*

Donald Scott Thomas, Jr., Paul J. Van Osselaer, Austin, Tex., for Pinkie's Inc. and Bob Grimes.

James C. Lewis, Charles B. Jones, Lubbock, Tex., for Kenneth Odom, Hubert Odom and Cecil's Inc.

Locke, Purnell, Boren, Laney & Neely, Thomas S. Leatherbury, Stanley E. Neely, Orrin Harrison, III, Dallas, Tex., for plaintiff-appellee cross-appellant.

Before GARZA, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

I

This is an appeal from a judgment for a class of consumers entered after a jury found a conspiracy by members of the Lubbock County Beverage Association [1] to fix the retail price of liquor in Lubbock County, Texas during the period June, 1970 to December, 1974. This private antitrust suit proceeding on the footing of section 4 of the Clayton Act, 15 U.S.C. § 15, followed a criminal antitrust complaint under the Sherman Act, 15 U.S.C. § 1, to which the defendants pled *nolo contendere.*

Greenhaw, a lawyer and former resident of Lubbock county, successfully sought certification of a class of all retail liquor purchasers who purchased from the defendants, for their own use, during the period of

---

**1.** The Lubbock County Beverage Association has since dissolved and is not a party to this appeal.

the alleged price-fixing conspiracy.[2] Notices were mailed to 6,734 identified class members, and an identical notice was run in the Lubbock newspaper.

The district court, at the request of the class, next bifurcated liability and damages pursuant to Fed.R.Civ.P. 42(b). Class certification anticipated that the first phase would include issues as to the existence of a conspiracy, its membership, and injury to the class as a whole, with the second phase devoted to the individual damages of class members.

The case was submitted to the jury in phase one on special interrogatories.[3] The jury found that defendants had all partici-

2. The class originally certified was defined as follows:

> all retail purchasers of alcoholic beverages, including beer and wine, from retail stores located in Lubbock County, Texas, owned, operated, or controlled by Defendants herein from March 1967 through December 1974. A person shall be deemed a retail purchaser if such purchase was not made for resale or solely for profit. A retail purchase includes purchases by a private club for its members and case purchases.

The class was later narrowed because of the unavailability of data relating to the prices defendants charged for wine and beer; the commencement date of the conspiracy was also advanced. Consequently, the class ultimately found by the jury to have suffered injury was defined as follows:

> All persons who purchased retail alcoholic beverages during the period from June 1, 1970 through December 1974 from retail stores located in Lubbock County, Texas owned, operated or controlled by any of the defendants: Pinkie's, Inc., Cecil's, Inc., Crossed Keys Package Stores, Inc., All Star Company, Bob Grimes, Hubert Odom, and Kenneth Odom. A person is a retail purchaser if such purchase was not for resale or solely for profit. Retail purchases of alcoholic beverages include purchases in case lot amounts, including purchases by a private club for its members.

3. These interrogatories and the jury's responses read as follows:

SPECIAL ISSUE NO. ONE

Do you find from a preponderance of the evidence that an unlawful conspiracy existed to raise, fix, stabilize or maintain prices charged by defendants and others for alcoholic beverages sold in Lubbock County, Texas between June 1, 1970 through December of 1974?

ANSWER: "Such a conspiracy did exist"

SPECIAL ISSUE NO. TWO

Do you find from a preponderance of the evidence that one or more of the defendants engaged in the unlawful conspiracy, if any you have so found?

ANSWER: "Yes" as to each defendant.

SPECIAL ISSUE NO. THREE

During what period of time, if any, do you find from a preponderance of the evidence the unlawful conspiracy existed, if any you have so found?

ANSWER: "From June 1970 to December 1974"

SPECIAL ISSUE NO. FOUR

Do you find from a preponderance of the evidence that the activities of defendants in purchasing and selling alcoholic beverages occurred in interstate commerce?

ANSWER: "Defendants' activities were in interstate commerce"

SPECIAL ISSUE NO. FIVE

Do you find from a preponderance of the evidence that the activities of defendants in purchasing and selling alcoholic beverages substantially affected interstate commerce?

ANSWER: "Defendants' activities did substantially affect interstate commerce"

SPECIAL ISSUE NO. SIX

Do you find from a preponderance of the evidence that the unlawful combination or conspiracy, if any you have so found, was a proximate cause of injury to plaintiff and the class members?

ANSWER: "It was a proximate cause of injury"

SPECIAL ISSUE NO. SEVEN

Do you find from a preponderance of the evidence that plaintiff and the class members did not know of the existence of the unlawful combination or conspiracy, if any you have so found, prior to November 9, 1972, and could not have discovered the existence of such conspiracy by exercise of due diligence prior to such date?

ANSWER: "They did not know of the conspiracy and could not have discovered it by due diligence"

SPECIAL ISSUE NO. EIGHT

Do you find from a preponderance of the evidence that defendants fraudulently concealed the existence of the unlawful combination or conspiracy, if any you have so found, prior to November 9, 1972?

ANSWER: "The defendants did so conceal the conspiracy"

SPECIAL ISSUE NO. NINE

What sum of money, if any, do you find from a preponderance of the evidence would reasonably and fairly compensate plaintiff and the members of the class for their damages, if any, in purchasing alcoholic beverages proximately caused by the unlawful combination or conspiracy, if any you have so found?

ANSWER: "$927,078"

pated in a price-fixing scheme extending from June, 1970 through December, 1974 and fraudulently concealed its existence, and that the plaintiff class had no knowledge of the conspiracy until a date within the statute of limitations. The jury found defendants' activities to have been "in" and "affecting" interstate commerce, and set total classwide "damages" at $927,078.

In the second phase, class members were invited to submit proofs of claims averring that they had made liquor purchases from the defendants during the conspiracy period, and that their claims were not barred by the statute of limitations. Claimants were told to supply estimated expenditure figures supported where possible by documentation such as receipts, cancelled checks, or credit card statements. The district court ordered all claimants to appear before a magistrate appointed by the district court to make findings and recommendations relating to claimants' recovery and costs and attorneys' fees. Any recovery by a class member failing to submit a claim and appear before the magistrate was barred. Those few claimants who appeared were ultimately determined to have suffered actual damages of $5,827. After trebling, the total damage award to plaintiff and all class members was $17,482.

The district court awarded to Greenhaw and his counsel costs of suit totaling $26,-903, and attorneys' fees of $246,517. Defendants' motions for J.N.O.V., amendment of judgment, or a new trial were denied, and this appeal followed. We affirm.

## II

First, the liquor retailers contend that the trial court abused its discretion in certifying the class. The retailers' charge is broadly stated. It is that this suit has been prosecuted for the purpose of filling lawyers' purses, as evidenced by the small amount finally awarded the class. It was clear from the start, the retailers argue, that no member of the class stood to recov-

er nearly as much as the class counsel if the suit was prosecuted to a successful conclusion.[4] A class action brought for the sake of the attorneys is frivolous and unmeritorious, defendants insist, just the sort of case the Supreme Court in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), urged district courts to weed out.

That class counsel may recover more than any individual plaintiff is not an infallible predictor of abuse. A class action is appropriate when the individual claims are small. Small individual claims do not necessarily present the frivolous and unmeritorious cases that the Supreme Court disparaged in *Reiter*. The Court in *Reiter* recognized that lawyers might sometimes be the biggest winners in suits, at least in an immediate sense. We acknowledge that Rule 23 may galvanize claims that would never have been made and thus foster a litigious attitude that needs no fuel. On the other hand, the class device is an enforcing mechanism for congressionally sanctioned goals. The short answer to these real concerns and conflicts in social policy is that the rule expresses a legislative judgment we are not free to second guess. 442 U.S. at 346, 99 S.Ct. at 2334 (Rehnquist, J., concurring).

This said, we need add only that the district court properly considered whether the elements prescribed by Rule 23(a) & (b) were present. The only serious attack upon the class certification that remains is answered by our sustaining of the district court's bifurcation of liability and damages, an issue we next discuss. We agree that the requisite conditions to support a class action were present, and are persuaded that the class certification was not an abuse of discretion.

### III. Bifurcation

The district court sliced the case horizontally into two phases, pursuant to Fed.R. Civ.P. 42(b), with classwide injury and damages to be determined by the jury in the

---

**4.** The largest recovery effected by any single member of the plaintiff class was $1779.63 with trebling.

first phase and with the amount of recovery by individuals to be determined by a magistrate in the second phase. The retailers argue vigorously that bifurcation was improper and that as a result of a mislocation of the horizontal slice the class prevailed without establishing fact of injury with respect to each class member, to the detriment of defendants' right to a jury trial. The retailers point out that certain members of the plaintiff class—those who bought liquor by the case and received attendant volume discounts—were not injured by any price-fixing activity, but the bifurcation prevented proof of this absence of injury at phase one or phase two. The argument is that no individualized showing of injury was required of class members in phase one, and in phase two the magistrate ruled that fact of injury as to every member of the plaintiff class had been established by the jury verdict. Thus whipsawed, neither the jury nor the magistrate considered the retailers' claim that one subset of the class suffered no injury. Retailers insist, therefore, that because the fact of injury is an element of liability that must be proved by a private antitrust plaintiff seeking money damages, the bifurcated proceeding enabled some plaintiffs to recover without proving a claim. In sum, the bifurcation slice is said to have relieved plaintiff of part of its burden of proof and violated the retailers' right to jury trial.

The difficulty faced by a trial judge considering bifurcation of a private antitrust suit at the time of class certification and in pretrial preparation is not rooted in procedure but in the circumstance that under the substantive antitrust law the "fact of injury" is part of the liability wing of the case. The problem presents an interplay of Rules 23 and 42(b) of the Federal Rules of Civil Procedure with the Seventh Amendment. For example, conducting the predomination analysis under Rule 23, it may be apparent that with a large class certified under Rule 23(b)(3) the case cannot be managed if the determination of "liability" will only generate thousands of distinct damage trials. While Rule 42(b) grants wide discretion to a district judge to separate issues for trial, it

is limited by a defendant's right to jury trial. That right to jury trial includes the right to have a single issue decided one time by a single jury. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931).

It follows that separating liability and damages must be done in a manner that does not allow the jury in phase two to determine again the damages established in phase one. The art of bifurcation is then ultimately the art of devising interrogatories for submission under Rule 49 that will elicit a jury answer in essentially formulaic terms. By that, we mean that the determination of the amount of damages in phase two becomes little more than an application of the formula found by the jury in phase one. We explained these principles in *Response of Carolina, Inc. v. Leaseco Response Inc.,* 537 F.2d 1307 (5th Cir.1976); *Alabama v. Blue Bird Body Co.,* 573 F.2d 309 (5th Cir.1978); and *In re Plywood Antitrust Litigation,* 655 F.2d 627, 635 (5th Cir.1981).

The answers given by the jury to questions submitted by Judge Pointer in the *Plywood Antitrust Litigation* are paradigmatic. There a class of consumers charged horizontal price fixing. The jury found that the injuries suffered by the class as a whole represented the difference between freight charges properly chargeable and fictional charges actually made. The finding that the class suffered a common injury, expressed as the difference between actual and phantom freight, resolved any Seventh Amendment concerns. It did so by preventing a jury in phase two from deciding the same question again. At the same time the substantive requirement of the fact of injury was established. With these principles in mind, we return to this case.

Our question here is whether the jury's findings on liability and damages are adequate in light of the retailers' assertion that the jury had no basis for determining that one group of class members—case purchasers—had been injured. We find no error, because we conclude that the issue of injury to the entire class was developed sufficiently for the jury, and the jury findings on this

record produced a calculus that prevented redetermination in phase two. As we will set forth in part IV below, we are persuaded that plaintiffs' expert supplied sufficient grounds to support a finding that case purchasers were injured.

## IV

At trial, the class relied almost exclusively on the testimony of its expert witness, Pat Loconto, to establish that defendants' price-fixing caused classwide injury.[5] The retailers now charge that Loconto's testimony was factually and legally insufficient to establish the fact of injury. We are unpersuaded.

### a.

Loconto was hampered by the unavailability of pricing information for defendants' stores during the conspiracy period, June, 1970 through December, 1974. The earliest data available had been gathered in the course of an FBI survey in August, 1975.[6] Because this data indicated price identicality among defendants' stores, Loconto concluded that the effects of the pricing conspiracy were still being felt at the time of the 1975 survey. Loconto next obtained the prices for the items included in the 1975 survey as they existed in defendants' stores in 1979. By 1979 price identicality had disappeared from Lubbock, and Loconto concluded that the market for liquor was competitive. Finally, Loconto obtained 1975 and 1979 prices for the survey items from a Dallas liquor store which presumably had been operating in a competitive market in both years.

By comparing the 1979 Dallas and Lubbock prices, Loconto generated a ratio which he testified described the relationship of prices in Dallas to prices in each of the defendants' stores in Lubbock when both markets are competitive. Separate ratios

were developed for each survey item, for each defendant. Applying these ratios to the 1975 Dallas prices supplied Loconto with a set of "should have been" prices for these products in the defendants' stores in 1975, prices for which these items would have sold if the Lubbock market had been competitive in 1975. By comparing these "should have been" prices to the actual prices charged in 1975, Loconto was able to estimate the amount of overcharge resulting from defendants' price-fixing activity.

Loconto thus produced a set of overcharge figures for each of the survey items for each bottle size included in the survey— fifths, quarts, and half-gallons— for each of the defendants' stores. Weighting these figures for the quantity of each product sold, Loconto finally arrived at an estimate of the average overcharge for all liquor sold in the defendants' stores during the conspiracy period. This average overcharge was 7.74%. Multiplying defendants' total aggregate liquor sales during the conspiracy period by 7.74%, Loconto estimated that the price fixing had netted defendants $927,078 in illicit surcharges.

Though Loconto's testimony was vigorously challenged by defendants, the jury found it persuasive. The jury found that defendants had engaged in illegal price-fixing to the damage of the plaintiff class, and that the aggregate amount of this damage was $927,078. In this latter finding, the jury evidenced some confusion, for Loconto's testimony put forth $927,078 as the aggregate damages to *all* liquor purchasers, including those who were not members of the plaintiff class either because they bought for resale or because they had opted out; necessarily, the damages to class members had to be a lesser figure. The 7.74% average overcharge figure, however, is not affected by the inclusion of some non-class-

5. Loconto, though not an economist, is a principal in a national accounting firm, with substantial experience in the calculation of antitrust damages. The trial court accepted him as an expert.

6. The FBI survey included the prices charged for fifths, quarts, and half-gallons of sixteen

popular brands of liquor. These products were selected from among the major classes of liquor sold by the defendants (scotch, bourbon, gin, etc.). For lack of more exact information, Loconto inferred that these products were representative of the classes of liquor to which they belong.

members in the aggregate damage figure. The district court correctly intuited that the jury had by necessity adopted the 7.74% figure proposed by Loconto—defendants so concede—and negated any error in the response to the damages interrogatory by applying the 7.74% figure to calculate individual recoveries in phase two.

The question before us now is whether Loconto's testimony provided sufficient evidence to support the jury's verdict. There are two relevant parts to the jury's verdict, and they are subject to different standards of review. There is first the question of injury in fact to the class, which had the burden to prove this element by a preponderance of the evidence. Second is the question of the quantum of damages. The burden on the class to make this showing is substantially lighter. Thus, Loconto's testimony is sufficient to support both parts of the verdict if the jury could conclude from it that the class had more likely than not suffered some financial injury as a result of defendants' conduct, and if it provided at least some reasonable, not speculative, basis for assessing damages at 7.74% of sales to individual class members.

■ The Supreme Court established these dichotomous standards of proof in *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), where it held that "there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount." *Id.* at 562, 51 S.Ct. at 250. The Court recognized that the amount of damages in an antitrust case will often be difficult to determine with exactitude.

In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference,

although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Id.* at 563, 51 S.Ct. at 250–51.

■ We think this principle established in *Story* remains apt in the present case. The unavailability of price records for defendants' stores during the 1970 to 1974 period is caused by no failure of diligence on the part of the class, but by defendants' failure to preserve such information. The rigorous measure urged by defendants would not allow for the use of reasonable inferences and educated projections. It is too much to demand for courtroom proof.[7] Nevertheless, we iterate that before a plaintiff may take advantage of this relaxed standard he must first prove fact of injury by the traditional preponderance of the evidence. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), *on remand,* 670 F.2d 575 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982); *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787, 791–92 (5th Cir.1983).

b.

With these precepts in mind, we turn back to the evidence. Greenhaw attempted to establish the fact of injury by means of evidence that 1) an unnatural price identicality prevailed in the Lubbock market during the alleged conspiracy period, 2) this price identicality appears to have been caused by defendants' deliberate anti-competitive behavior, 3) this price identicality disappeared once competition was restored to the Lubbock market sometime after 1974, 4) the movement in prices in Lubbock between 1974 and 1979, as compared to price movement for the same period in Dal-

---

**7.** No recovery was permitted here for alleged overcharges on the sale of beer and wine precisely because no information was available in 1976 concerning the prices charged for these products over the course of several prior years. *See* note 4, *supra.* The district court was cor-

rect to exclude wine and beer purchasers from the plaintiff class, because in the absence of *any* price information the proof of damages would almost surely have been unduly speculative. *Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250.

las, indicates that defendants' conduct caused liquor prices during the conspiracy period to be pegged at a rate higher than would have prevailed had the market been competitive at that time, and 5) these overly-high prices caused defendants' customers to pay a surcharge which constitutes damages recoverable under section 4 of the Clayton Act.

We think points one, two, and three from this pattern were established plainly by a preponderance of the evidence.[8] Point five flows naturally from point four, except possibly for case purchasers, a question we will address presently. The narrower question, therefore, is whether point four has been satisfactorily established. Retailers argue not, aggressively challenging Loconto's analysis.

■ Once the jury decided that the defendants had engaged in price fixing, they had only to determine whether the result of this activity was likely to be prices that were artificially high. Despite some flaws, Loconto's analysis was sufficient to aid the jury in answering this question. We have previously observed that once plaintiffs

> prove a statutory violation in the form of a price fixing conspiracy with respect to a homogeneous or fungible product ..., it is not unlikely that plaintiffs also will be able to prove by a preponderance of the evidence that purchasers of the product in question were injured in their property ....

*In re Plywood Antitrust Litigation,* 655 F.2d 627, 635 (5th Cir.1981), *cert. granted,* 456 U.S. 971, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982). Here, as in the *Plywood* case, the jury chose to believe the plaintiffs' expert when he testified that the plaintiffs were injured when they bought in an anticompetitive market, and to disbelieve the defendants' expert who testified that no one was hurt. We do not think defendants' attacks on Loconto's analytic methods provide a basis for disturbing the jury's verdict.

c.

■ Even were it granted that most of defendants' customers paid a surcharge as a result of the price fixing, defendants adamantly insist that there was no showing of injury with respect to purchasers who bought liquor by the case and received a substantial discount off the shelf price. The magistrate in phase two noted that this case discount was usually greater than the estimated 7.74% surcharge in the shelf prices caused by the price-fixing activity. Consequently, the retailers urge, case purchasers were not injured by any surcharge that may have been built into the shelf price.

Though this argument has superficial appeal, it collapses in the absence of an assumption that case discounts would not have been offered in a competitive market. The jury, however, heard testimony indicating that case purchasers were receiving discounts under competitive conditions proportionately equal to the discounts they received under non-competitive conditions.[9] Moreover, the ability to impose an artificially high price results from market power. Because there was no indication that defendants' market power, when acting in concert, was weaker with respect to cases than with respect to individual bottles, the jury was entitled to infer that retailers, whose power in combination was otherwise shown by their price fix and who overcharged for individual bottles, would carry an inflated, if discounted over individual units, price for cases. Such an inference is short of impermissible speculation.

The case, as the defendants have ably argued, is not unassailable, but on the total-

---

**8.** Point two—the evidence respecting defendants' anti-competitive conduct—will be discussed further in part VI, *infra.*

**9.** This testimony came during cross-examination of defendant Kenneth Odom, one of the owners of Cecil's and Mark's:

> Q. [W]ith regard to your average discount on cases to consumers, you said 12 to 13 percent. Would that have been in the area of '70 to '75?
> A. Up through today.
> Q. So, up through today it has been pretty constant, around the same discount level?
> A. Yes, sir.

ity of the evidence we affirm the jury's finding of injury in fact as to all liquor purchasers.

d.

■ We turn next to the finding as to the quantum of damages. As noted above, this showing enjoys a relaxed burden of proof if rational, reasonable, and articulably related to the evidence, a product of inference rather than speculation. *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 995–96 (5th Cir.1983); *In re Plywood Antitrust Litigation,* 655 F.2d at 635; *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 858 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981). Measured by this standard, the damage figures generated by Loconto and adopted by the jury are supportable.

■ Defendants charge that the trial court incorrectly applied the 7.74% average overcharge figure to purchases of all sizes of liquor at all of their stores in calculating the injury to each individual liquor purchaser. As Loconto had developed average overcharge figures for each of three sizes of liquor containers, fifths, quarts, and half-gallons, for each of defendants' stores, defendants assert that these figures should have been applied in phase two rather than the 7.74% average figure. Application of the individualized figures, however, would entail a tacit presumption that even if the market had been competitive shoppers would have made their purchases in the same stores where they shopped given noncompetitive conditions. Such a presumption is unwarranted. Confronted with price identicality, consumers had no price-related reason to prefer one store to another.[10] Had the market been competitive, consumers would presumably have sought the lowest price, and many purchases would therefore have been made in stores other than where they were made in the noncompetitive climate. Accordingly, it was more reasonable to apply the market average overcharge figure in calculating damages rather

than separate figures for each store in which purchases were made.

A tenable claim could be made that the actual damage suffered by each consumer was the difference between the price actually paid, which would be the same regardless of which store he patronized, and the *lowest* price that would have been available in a competitive market, rather than an average of the competitive prices. The underlying presumption, of course, would be that every consumer would have shopped to find the lowest price for each purchase. That this theory was not advanced at trial may explain why Loconto testified that his damage estimate was "conservative."

V

■ A claim was timely only if it did not arise before November 9, 1972 absent fraudulent concealment or other tolling. *See* 15 U.S.C. § 15b (four-year statute of limitations under the Clayton Act). Of course a limitations period will be tolled if a plaintiff can "show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1169 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980).

The jury in phase one returned special interrogatories finding that class members had no knowledge, nor could by the exercise of diligence have attained knowledge, about the price-fixing conspiracy before November 9, 1972, and that defendants wilfully concealed their unlawful conduct. Then in phase two, each claimant was required to affirm that he had no knowledge about the conspiracy before November 9, 1972, and each claimant was made available for cross-examination on this point.

■ The retailers first argue that there was no evidence to support the jury's find-

---

10. Because the defendant stores were all located in close proximity to one another and offered comparable services, it appears unlikely that consumers would have had any powerful nonprice-related reason to prefer one store to another.

ing with respect to the knowledge of particular class members. We agree. Greenhaw was the only class member to testify, and his testimony as to his own lack of knowledge would not support a finding with regard to the class as a whole.

The district court, while understandably cautious, need not have submitted this issue to the jury at all, and the jury finding is without meaning. The meaningful inquiry into the state of knowledge of each class member was by necessity a phase two inquiry. The inquiry at phase two was sufficient to assure that no recovery was effected by any claimant whose individual claim was in fact time-barred. Moreover, because the jury verdict on the knowledge of the class was without effect, there proved to be no meaningful danger of conflicting determinations between phase one and phase two. In sum, this putative dual determination did not violate the precepts for bifurcated proceedings we enunciated in *Alabama v. Blue Bird Body Co.*, 573 F.2d at 318, and the retailers do not deny sufficiency of evidence in phase two to establish that the prevailing individual claimants were not time-barred.

■ The court also asked the jury in a separate interrogatory whether defendants fraudulently concealed their price-fixing activity. This was a class issue properly put to the jury in phase one, inquiring as it did of defendants' conduct.

■ The retailers argue that no evidence indicated concealment. We are unpersuaded. There was evidence of secret agreements and covert price-setting sessions. The concealment comports with common sense. Such activities are normally concealed, especially in light of the criminal and civil penalties that may result if they are discovered. Accordingly, there is ample support for the jury's verdict.

## VI

The retailers claim three errors in the charge. Two of these three, the need to prove fact of injury with respect to every class member and the jury's determination of a class-wide damage figure, we have already considered. We turn to the third issue. The retailers claim error in the instruction that an exchange of price information alone establishes the existence of an agreement or conspiracy. This instruction, they urge, conflicted with the instruction, which defendants assert is the correct statement of the law, that a business concern may copy a competitor's price list and conform exactly to those prices, without this practice providing any evidence of an unlawful agreement or conspiracy.

These two instructions do not conflict, for the one deals with a deliberate exchange of information among competitors, while the other entails only the act of one individual obtaining and conforming to his competitor's price list. One is a conspiracy and the other is not. The question is whether the instructions are correct when read with the balance of the charge and laid in the context of this trial.

■ The retailers are correct that violation of the Sherman Act is not necessarily established by an exchange of price information. *United States v. Container Corp. of America*, 393 U.S. 333, 338–39, 89 S.Ct. 510, 513, 21 L.Ed.2d 526 (1969) (Fortas, J., concurring). Further evidence of an actual fixing effect on prices must be adduced before an antitrust violation is established. *Id.* Here, the trial judge instructed the jury that "when competitors exchange price information with each other, that alone is sufficient to establish the existence of an agreement or conspiracy." Taken out of context, this instruction would be misleading because it does not also explain that this exchange only furnishes the combination element of the Sherman Act. However, in the very next sentence the judge instructed further: "Price information exchanged in some markets may have no effect on a truly competitive market, but if the effect of an exchange of prices among competitors is to fix, raise, maintain or stabilize those prices, then there is an unlawful conspiracy to fix prices in violation of the antitrust laws." Read in its entirety, this charge properly informed the jury of the

findings that might permissibly be drawn from the evidence. It must not be forgotten that the charge gains definition from oral argument. Defense counsel in his summation here advised the jury to read the charge as a whole: "[T]he extent of the problem is: Did these people sit down and reach an agreement? ... Did they agree that nobody would charge any prices different from these lists?"

 *Kline v. Caldwell, Banker & Co.,* 508 F.2d 226 (9th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), involved a real estate brokers trade association which sent a schedule of suggested fees to its members. The court held that mere receipt of the schedule and continued membership in the association did not *per se* make any individual broker a member of a conspiracy. In contrast, the jury could have concluded from the evidence here that the defendants actively engaged in exchanging price information and negotiating the prices to be charged by liquor retailers in Lubbock County. Of course, active exchange of information establishes participation in an agreement or conspiracy. After the fact, we see the trial court could have been more exact in defining the additional elements that had to be present for the agreed exchange to become an illegal fix, but read in context the jury was properly instructed. In sum, though distinguishing between competitors exchanging price lists and competitors fixing a price may entail abstract line drawing, the distinction does not require unusual training to perceive. One facilitates and the other stifles competition. We think these jurors knew the difference.

### VII

 The retailers' contention that the jurisdictional requirement that defendants' activities occur in or have a substantial effect on interstate commerce was not met in this case has no substantial merit. It is not necessary to determine here whether defendants' activities were "in" commerce, as the "effect" test is less stringent and will also supply the jurisdictional element of an antitrust action under the Sherman and Clayton Acts. *See Hiram Walker, Inc. v. A & S Tropical, Inc.,* 407 F.2d 4, 8 (5th Cir. 1969) (distinguishing Sherman Act actions from Robinson-Patman actions where the activity must be "in commerce").

 In *Chatham Condominium Assns. v. Century Village, Inc.,* 597 F.2d 1002, 1006 (5th Cir.1979), we noted that in enacting the Sherman Act "Congress intended to exercise its power to the fullest extent under the Commerce Clause." We think it apparent that Congress could, if it so chose, employ the Commerce Clause to prohibit local price-fixing of a product which is all imported from other states, albeit by means of a middleman wholesaler located in the same state as the price-fixing retailer. *See Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (restaurant which purchased $70,000 worth of meat from a local supplier who had procured it from outside the state was subject to acts adopted under Congress' Commerce Clause powers); *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) (Sherman Act violated by wholesalers of imported liquor who divided up sales territories, even though all of their sales to retailers occurred in-state).

 The jury finding that the defendants' business activities were having some "not insubstantial effect on the interstate commerce involved," *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) is supported by the evidence, and we will not disturb it.

### VIII

 Defendants contend that the district court abused its discretion by awarding the $246,517 in attorneys' fees, when the actual recovery by members of the plaintiff class was only $17,482 after trebling. The district court is afforded broad discretion to determine the award of attorneys' fees. *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983),

*Taylor v. Sterrett,* 640 F.2d 663, 668 (5th Cir.1981).

We listed considerations in setting a fee award in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974).[11] These considerations were properly weighed by the trial court, which ultimately awarded fees in the "lodestar" amount (hours worked times standard hourly rate).

■ Though the fee award in this case is many times greater than the recovery actually effected by members of the class, this actual recovery figure does not control the inquiry. Lawyers for the class should not be penalized for the failure of more individual class members to come forward and claim a portion of the fund that had been made available as a result of counsel's efforts in phase one. Though no exact dollar value was ever ascertained for this fund—the $927,078 figure set by the jury included overcharges of non-class members—it certainly totalled many hundreds of thousands of dollars, and with trebling the potential class recovery was probably in the vicinity of $2,000,000. In relation to this latter figure, the $246,517 attorneys' fees award does not appear disproportionate.

■ Because not all members of the plaintiff class came forward to make individual claims, defendants point to the Supreme Court's recent decision in *Hensley v. Eckerhart,* where the Court held that a district court would have to justify specifically its decision not to reduce the fee award to a plaintiff's counsel who prevailed on only some of the claims he prosecuted. *Hensley* is not apposite. The class prevailed across-the-board in phase one where the substantive liability issues were tried. Class counsel should recover the full value of their contribution to this accomplishment. Further, though some of the individual claims advanced in phase two were dis-

allowed or reduced in amount, we do not conclude that these minor reverses necessitate any diminution of the fee award settled upon by the district court after full consideration of the entire course of this litigation.

■ By the same token, we must reject the claim raised in plaintiffs' cross-appeal that the district court committed error in failing to award attorneys' fees above the lodestar amount. Though the parties may disagree over the difficulty of the issues implicated in this case, the societal benefit flowing from this litigation, and other such questions, all these matters were considered by the district court. Once a district court has diligently weighed the *Georgia Highway Express* criteria, its determination is reviewable only for an abuse of discretion, *see Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334, 341 & n. 20 (5th Cir.1970), and none appears here.

IX

In their cross-appeal, the class charges that the district court erred when it ordered all claimants in phase two to appear before the magistrate and undergo cross-examination. The class insists that the affidavits filed by class members were sufficient to support the award of damages to these claimants unless defendants specifically denied a claimant's entitlement to the damages sought. The case principally relied upon by plaintiffs, *Dickinson v. Burnham,* 197 F.2d 973 (2d Cir.), *cert. denied,* 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952), is distinguishable, however, because claimants there had better documentation of their claims than claimants in the present case.

■ We need not here decide whether defendants had a Seventh Amendment right to cross-examine every member of the class advancing a claim; they had this right

---

11. These guides are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amounts involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

if there were any disputed questions of fact to be resolved. The Defendants did not want jury trials and the district court ordered all claimants to appear for direct and cross-examination. The class suggests that this was error. Though some class members may have been deterred from pursuing their claims by the prospect of expending the time and effort to appear before the magistrate, the district court was obliged to protect the rights of the defendants as well, and requiring the individual claimants to appear was a proper means of fulfilling this function.[12]

██ In similar fashion we dispose of the class's other complaints about the phase two proceedings. The district court refused to permit claimants to increase the amounts of their claims after the initial filing in phase two. The court also refused to permit any claimants to file after the deadline set in the class notice. These rulings are within the range of the trial court's discretion to control the course of the litigation before it and to protect the defendants from spurious claims. Our review of the handling of certain specific claims which Greenhaw asserts were improperly denied likewise finds no error requiring reversal.

## X

██ The class was awarded court costs of $26,903. In a cross-appeal the class charges error in the district court's refusing greater recovery for expert witness fees and certain other litigation expenses. The trial court held that costs in this sort of suit are governed by 28 U.S.C. § 1920, and denied the award of some expenses. Five months after the entry of judgment by the district court, however, this court held in *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1100 (5th Cir.1982), that § 1920 should not govern the award of expert witness fees; such sums can be awarded as part of attorneys' fees. In defense of the district court's ruling, defendants cite

*Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964), which held expert witness fees limited by § 1920; in *Copper Liquor,* however, we explicitly declined to follow the lead of the ninth circuit and other courts on this issue. 684 F.2d 1087, 1100 & n. 46. Consequently, this question must be remanded for reconsideration of the award of expert witness fees. With respect to the other expenses disallowed by the district court, we find no reversible error.

## XI

To summarize our holding: We find that the district court properly certified the plaintiff class under Fed.R.Civ.P. 23, and properly bifurcated this action under Fed.R. Civ.P. 42(b). All jurisdictional elements for a Sherman Act action were adequately established, and both the fact and quantum of injury were properly shown for all class members who were afforded recovery; these claimants also established the timeliness of their claims. The award of attorneys' fees made by the district court was a proper exercise of its discretion. With the change in the law we must VACATE the award of expert witness fees and REMAND for redetermination of the proper amount of this award. In all other respects, the judgment is AFFIRMED.

---

12. Counsel's suggestion at oral argument that Rule 56 may be a valuable resource for the conduct of phase two proceedings is certainly well taken but we decline the suggestion to view this proceeding at phase two as an effort to move for summary judgment under Fed.R. Civ.P. 56. We are not convinced that Rule 56 was invoked below.