**In re COORDINATED PRETRIAL PROCEEDINGS IN PETROLEUM PRODUCTS ANTITRUST LITIGATION.**

**MDL No. 150–WPG.**

United States District Court,
C.D. California.

Nov. 25, 1986.

Alison B. Swan, Chief Counsel, Antitrust Div., Office of the Attorney General, Phoenix, Ariz., on behalf of the State of Ariz.

Office of the Attorney General John Van de Kamp by William S. Clark, Deputy Atty. Gen., Thomas P. Dove, Deputy Atty. Gen., Dept. of Justice, State of Cal., San Francis-

co, Cal., Sanford Gruskin, Deputy Atty. Gen., Dept. of Justice, State of Cal., Los Angeles, Cal., and Spiegel, Cutler, Liao & Kagay by Michael I. Spiegel, et al., San Francisco, Cal., on behalf of State of Cal.

James Smith, Atty. Gen. by Jerome W. Hoffman, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., and Larry H. Evans, Chief, Antitrust Section, State of Fla., Dept. of Legal Affairs, Tallahassee, Fla., and Stephen L. Dunne, Del Mar, Cal., on behalf of State of Fla.

Dave Frohnmayer, Atty. Gen. by Richard L. Casell, Chief Counsel, Antitrust Div., Salem, Or., on behalf of State of Or.

Ken Eikenberry, Atty. Gen. by John R. Ellis, Asst. Atty. Gen., Consumer Protection and Antitrust Div., State of Wash., Seattle, Wash., on behalf of State of Wash.

Hughes, Hubbard & Reed, New York City, by Otis Pratt Pearsall, Philip H. Curtis, Bruce R. Kelly, Linda Trummer-Napolitano, and Hughes, Hubbard & Reed, by Ronald C. Redcay, Matthew T. Heartney, and Donald A. Bright, Associate Gen. Counsel, Howard S. Fredman, Thomas H. Reilly, Legal Dept., Atlantic Richfield Co., Los Angeles, Cal., on behalf of Atlantic Richfield Co.

McCutchen, Black, Verleger & Shea, Los Angeles, Cal., by Philip A. Verleger, David A. Destino, and Charles W. Matthews, House Counsel, Exxon Co. U.S.A., Houston, Tex., on behalf of Exxon Corp.

John E. Bailey, Harry P. Davis, Jr., Law Dept., Houston, Tex., on behalf of Chevron U.S.A. (Gulf Oil Co.).

Hogan & Hartson, Washington, D.C. by Andrew J. Kilcarr, Maureen O'Bryon, and Charles F. Rice, Asst. Gen. Counsel, Charles B. Straus, III, Counsel, New York City, on behalf of Mobil Oil Corp.

Howrey & Simon, Washington, D.C. by William Simon, William O'Brien, Robert M. Bruskin, and William Winters, Robert J. Decker, Corporate Law/Sec, Houston, Tex., on behalf of Shell Oil Co.

Pillsbury, Madison & Sutro, San Francisco, Cal., by Robert P. Taylor, Robert A. Mittelstaedt, Roderick M. Thompson, and Smathers & Thompson, Miami, Fla. by

David Batcheller, on behalf of Standard Oil Co. of Cal.

Leslie C. Randall, Texaco, Inc., Los Angeles, Cal., and R.D. Wilson, G. Kenneth Handley, Texaco, Inc., White Plains, N.Y., and Kaye, Scholer, Fierman, Hays & Handler, New York City by Barry Wilner, Aton Arbisser, on behalf of Texaco, Inc.

Brobeck, Phleger & Harrison, San Francisco, Cal. by John Sparks, and Brobeck, Phleger & Harrison by Darryl Snider, and E.A. McFadden, Harold E. Zahner, House Counsel, Union Oil Co., and Robert G. Pott, Asst. Counsel, Union Oil Co., Los Angeles, Cal., on behalf of Union Oil Co.

GRAY, District Judge.

In this long pending litigation, the Attorneys General of the plaintiff States charge the defendant major oil companies with violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The contentions are that these defendants conspired to fix the retail prices of gasoline, to create in this country shortages, either actual or purported, of petroleum products, and to refrain from competing with each other for contracts for the sale of petroleum products to the plaintiff States and their governmental subdivisions. The defendants have moved for summary judgment on each of these issues; such motions were argued on November 19, 20 and 21, 1985; and the matter was taken under submission by the court. The defendants' motions now will be granted.

In the laborious process of reaching this decision, I have reread the extensive briefing on the motions, studied the transcript of the oral arguments, and examined all of the exhibits that were referred to in such arguments. Having done so, I am convinced that, after several years of exhaustive discovery, the plaintiffs simply do not have the proof necessary to establish their contentions.

The plaintiffs have disclosed no direct evidence of conspiratorial conduct and, with the exception of Florida, which will be discussed later, they almost admit such lack. Instead, in their pretrial briefs and

their opposition memoranda, the plaintiffs rely upon certain factual items and comments selected from the mass of documentary and deposition material that they have obtained. From this material they draw inferences favorable to their contentions and assert that they thereby have presented issues that must be resolved by a jury. In doing so, they embrace the proposition laid down in *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), that "[o]n summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."

However, such a process fails to meet the standard announced by the Supreme Court in *Matsushita Electric Industrial Co. Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 574, ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986), which was decided after the plaintiffs' documentary and oral presentations were submitted:

"To survive a motion for summary judgment ..., a plaintiff seeking damages for violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently [citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, [104 S.Ct. 1464, 1470, 79 L.Ed.2d 775] (1984)]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action...."

As will be discussed in this memorandum, the defendants, in accordance with Fed.Rule Civ.Proc. 56(c), have made a substantial evidentiary showing that in all relevant respects they acted independently and in their individual interests. In the face of such showing, the plaintiffs have the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.Rule Civ.Proc. 56(e). The Supreme Court, in *Zenith*, also instructs us that under such circumstances the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts, ..." and that "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" 475 U.S. at ——, 106 S.Ct. at 1356 (1986).

Many of the inferences of collusion that the plaintiffs draw from the evidence must be categorized as *non sequitur*. Some of the inferences are based upon facts that could be considered to be in harmony with the existence of a conspiracy if the existence of a conspiracy be assumed. However, such facts are equally in harmony with competitively motivated individual conduct, and we know from *Zenith* that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." 475 U.S. at ——, 106 S.Ct. at 1357 (1986). None of the facts relied upon by the plaintiffs constitute evidence " 'that tends to exclude the possibility' that the alleged conspirators acted independently," as is required by *Zenith*.

In approaching the task of resolving these motions for summary judgment, I have kept fully in mind the injunction in *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." On the other hand, I also am aware that *Poller* "merely teaches caution," *Barnes v. Arden Mayfair Inc.*, 759 F.2d 676, 680 (9th Cir.1985) and that "if there is no genuine issue of material fact, and if the resisting party does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment." *Filco v. Amana Refrigeration Inc.*, 709 F.2d 1257, 1260 (9th Cir. 1983). This court is convinced that the foregoing quotation states the situation here concerned and that the duty to grant summary judgment follows accordingly.

In discussing the bases for my ruling, I cannot hope to advert to each of the hundreds of evidentiary items upon which the parties rely in pursuing and opposing the

current motions. However, I shall undertake in somewhat general terms to discuss what the facts in the record show and do not show with respect to the alleged conspiracies. I also shall comment upon some specific factual contentions, in support of my representation that I have given careful consideration to the record, and in order to illustrate some of the difficulties that I have with the plaintiffs' case.

## I. THE ALLEGED PRICE FIXING CONSPIRACY.

The defendants regularly refine gasoline which they sell to operators of retail service stations at what are called tank wagon prices. The retail dealers, in fixing the prices that they charge the consuming public, add to the tank wagon prices whatever they feel the traffic will bear, in light of prices charged by competing stations.

In times when supply is plentiful, prices tend to work their way downward as some dealers seek to increase their market shares by charging less, prompting competitors to do likewise. This downward trend is usually led by "independent" stations that are not affiliated with the defendant major oil companies.

If a retail gasoline dealer that sells the product of one of the majors fails to participate in these price reductions, his market share decreases, resulting in loss of income to him and his supplier. Accordingly, the defendant companies, in order to enable their dealers to remain competitive, share with them the burden of having to reduce the retail prices by giving them discounts from the tank wagon prices. The continuation of these successive reductions in retail prices, known as "price wars," results in losses to everyone except the consumer. In due course, one or more of the defendant companies concludes that the market has "had enough" and removes or reduces the dealer discounts and thus restores or approaches the published tank wagon prices. (Such actions will be referred to hereinafter as "restorations.") The other majors usually make similar restorations, and their respective dealers normally find themselves obliged to respond promptly with corresponding increases in their retail prices to the consumers. The independents tend to do the same. Thus, the market prices return to the levels from which the decline started. In due course, however, the competitive desire to increase market share causes the downward movement of retail prices to begin again, and the cycle of dealer discounts, price wars and restorations starts all over again.

### A. *Regarding Plaintiffs' Initial Contention That The Defendants Conspired To Have Simultaneous Restorations.*

The initial contention of the plaintiffs was (and possibly still is) that the sharp restorations to "normal" tank wagon prices were agreed upon in advance by the defendants and thus constituted an antitrust conspiracy. They undertake to support this contention in several ways.

1. *The Lundberg Surveys.* The plaintiffs rely primarily upon recordations by Lundberg Survey, Inc. of retail gasoline prices in the principal metropolitan areas of the plaintiff states. The plaintiffs have charted these prices, and such charts are remarkably similar with respect to the various areas. They uniformly show that the prices of gasoline at retail stations moved downward by a series of steps during periods of weeks or months. The prices then suddenly jumped back to the starting point, the charts reflecting a substantially vertical upward return. These successive cycles give a sharp "saw-tooth" appearance. The charts also show the retail prices of the independents moving with those of the majors' stations in almost an identical manner but about four cents per gallon lower. The plaintiffs contend that the charts are strong evidence of conspiratorial actions, because the restorations would not have been so instantaneous and with such unanimity if the defendants had been acting independently. The defendants challenge the significance of the charts as indications of conspiracy. I agree with the defendants.

(a) *The charts do not show the defendants' wholesale prices.* The charts pur-

port only to show the retail prices at the service stations, rather than the prices that the defendants charged their dealers. It is far from established that retail dealers lowered and raised their prices automatically with, and proportionate to, the discounts that were granted and later withdrawn by their defendant suppliers. The evidence shows that some dealers increased their prices while still receiving discounts, because they could no longer afford to do business at low margins, or because they saw competitors' published prices go upward. Others dropped their prices to meet competition, even though corresponding discounts were not granted by their suppliers. The plaintiffs recognized in their Initial Pretrial Brief (paragraphs 3–507—3–525) that "maverick" dealers, those that did not follow prices suggested by their respective major suppliers, had a very significant effect upon the retail gasoline market. Thus, the cycle of retail price changes reflected by the charts does not establish that the defendants' wholesale prices followed the same pattern.

(b) *The charts reflected prices recorded weekly.* The plaintiffs refer to the charts as showing simultaneous price restorations by all defendants. This is not necessarily so, because the Lundberg people only undertook to chart the stations weekly. For example, a Mobil dealer might raise his prices four cents on Monday, due to advance notice of a restoration that Mobil had given him on the preceding Friday. The owner of an Arco station across the street would note and report this change to his supplier, with the result that he received a dealer's allowance and increased his prices by four cents on the following Friday. The Lundberg representative would check both stations later that same Friday and report the two increases as having been simultaneous, despite the gap of at least four days in the respective determinations by Mobil and Arco to institute them.

(c) *The charts show average prices.* According to Mr. Lundberg in his deposition, the fact that he averaged his data concealed price differences of as much as eight cents per gallon, which tends substantially to mask the relationships of the individual

price changes to each other, as well as differences in their timing.

(d) *Closely parallel retail prices of gasoline do not establish conspiracy.* It is evident from the foregoing that the charts based upon the Lundberg Surveys do not show that the defendants changed their respective wholesale prices at the same times and to the same extents. They do show, however, that retail gasoline prices tended to move downward for a while and suddenly to jump back up to the point from which the decrease began. Wholesale prices play a major part in any decision to set retail prices, and we therefore can assume that the defendants' wholesale prices had a tendency to follow a similar pattern. But that is the most that can be assumed from the charts. The plaintiffs urge that "the critical question in assessing the parallel nature of defendants' prices is not what the individual prices were but rather whether the 'central tendency' of each defendant's prices was to move up at the same time as the prices of other defendants." (Plaintiffs' opposition brief, page 22.) However, a showing of such similarity is at least as indicative of vigorous and alert competition as it is of collusion. "[E]ven if [the plaintiff] could establish closely parallel pricing patterns between the two brands, in an industry where prices are likely to be similar, such evidence does little to establish an illegal conspiracy." *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1362 (9th Cir.1976).

2. *Instances Of Prior Knowledge Of Restorations As An Indication Of Collusion.* The plaintiffs present several instances that they allege to support inescapable conclusions that the restorations were collusively arranged. I have examined each of them and have not been impelled to any such conclusion. Two examples emphasized by the plaintiffs are summarized here.

(a) *The Jones Diary.* In 1970, Mr. C.R. Jones, of Mobil, kept a desk diary. The period from March 19 to the end of the month was blocked out to indicate vacation time. However, the "box" for the date of March 26 contains the notation of an an-

nouncement by Mobil of a restoration of .70 cents per gallon effective March 30, and the "box" for the latter date notes such an increase as being effective. (Tab 73 of plaintiffs' exhibits for the hearing on the motions for summary judgment.)

The plaintiffs infer from the foregoing that Mr. Jones must have made the subject entries before he went on his vacation. They also draw a conclusion as to how he got his advance knowledge of the restoration: In about February of 1970, Mr. Jones' boss, a Mr. Bade, had attended a meeting of the American Petroleum Institute and had dined with a vice-president of marketing of Standard Oil Company of California. The plaintiffs draw the inference that "... the industry at the A.P.I. meeting agreed on this price increase and restoration that was going to happen and Mobil who was going to be the one on a nationwide basis to lead it. When Bade gets back, he tells Jones what is going to happen, Jones writes it in his calendar, and it takes place just as organized." (Transcript of summary judgment hearing (The Transcript), page 122.) Mr. Jones, at his deposition, could recall nothing about the matter, nor could he identify the handwriting in the subject notations of his diary. It seems to me that the plaintiffs' inferences constitute speculations that are across the border into fantasy.

(b) *The Nerheim Alert.* A pricing clerk of Standard Oil Company made a handwritten memorandum, the first sentence of which the plaintiffs quote: "July 26, 1971 (for: 05 p.m.) AG Nerheim [Socal] called to inform us of the possibility of Shell returning to normal effective opening of business 7/27/71." (Plaintiffs' opposition memorandum, page 36.) However, the balance of the memorandum, which the plaintiffs do not mention, is highly significant. The second sentence reads: "Have field watched closely and report any movement to him." Apparently, this admonition was carried out, because there follows in the memorandum a list of twenty-eight individual gasoline stations with figures opposite each indicating its prices and the changes therein, most of which showed upward movement to about 39.9 cents per gallon.

The remaining item shows a time of 1:30 p.m. and reports information received by the writer that his own company, Socal, had determined to withdraw its dealer allowances at 12:01 a.m. the next day. (Tab 13(a) of defendants' exhibits for hearing on summary judgment motions.)

We do not know where Mr. Nerheim got his information concerning Shell's impending move. As the plaintiffs point out (at paragraph 4–377 of their Pretrial Brief): "Shell dealers and jobbers would be informed of Shell's new prices the day before the public announcement and would be requested to change their prices accordingly." It may be that Mr. Nerheim saw a Shell dealer changing his price posting sign. In any event, the instruction to "have field watched closely" to see what Shell was about to do, and the exhaustive manner in which the "field" carried out this instruction, tend to dispel any suggestion that a restoration had been agreed upon in advance by any two or more of the defendants.

3. *The "Impossibility" Of A Company Making A Restoration Independently.* The plaintiffs insist that the restorations made by the defendants must have been collusive, because it would be "impossible" for one company to do so alone. "Nobody can sit out there ten cents above the market without knowing that the other companies are going to go and follow you." (Transcript, page 31.)

Naturally, in a highly competitive market no company is going to increase its prices substantially unless it believes that its competitors will be ready to follow promptly, because of the potential loss of market share. But this does not mean that collusion is necessarily involved. The record shows that in several instances one of the defendants determined to "test the water" by instituting a partial or full restoration. It then carefully watched for the reactions of the other defendants. Sometimes they did not follow and, after a few days, the "would be" leader was obliged to restore the dealer's allowance.

4. *Mutual Socialization By Defendant Executives.* The plaintiffs assert that the defendants "used trade association meetings and other activities to exchange competitive information." (Plaintiffs' opposition brief, page 63.) They then refer to twenty-three paragraphs from their Initial Pretrial Brief in documentation of this assertion. Most of these references simply name the various employees of the respective defendants that were members and attended meetings of trade organizations such as the American Petroleum Institute. At these meetings they socialized with each other, and occasionally a paper of mutual interest was presented or circulated. Perhaps the most sinister relevation was that "J.R. Horkey (NOJC) discussed market conditions with Frank Staub (Shell), marketing vice-president for Shell Oil, at the March 1972 NOJC meeting." (Plaintiffs' Pretrial Brief, paragraph 4-1217).

In *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), the opinion said:

"Hanson's argument hinges on some documented meetings between Standard and Shell executives at an oil trade association meeting and at other times in San Francisco where their offices are located. When an illegal conspiracy or agreement to restrain trade is charged, there must be evidence from which actual agreement or a mutual consent can be found or inferred. *Esco Corp. v. United States*, 9 Cir., 1965, 340 F.2d 1000, 1007-08. Thus, evidence of meetings alone is not sufficient; there must also be evidence sufficient to permit the jury to infer illegal agreement."

Nowhere in the plaintiffs' briefs or exhibits is there any evidence that discloses a conversation between or among representatives of the defendants that was even remotely involved with price fixing.

5. *Testimony Of Individuals.* The plaintiffs appear to rely heavily upon the deposition testimony of Mr. Ken Anderson, who had been a regional manager for Amoco's dealer training program in an area that included Florida. He testified that from time to time, at the request of a sales representative of a defendant, he would call upon one of his own retail dealers that was pricing below market and urge him to increase his prices. He also said that he had asked representatives of competing companies to cause their "maverick" dealers to raise their prices to the market level. However, Mr. Anderson acknowledged that his direct participation in any of these matters ended in 1967, which was well before the decision in *United States v. Container Corporation of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) (see pages 19 and 20, *infra*). After 1967, Mr. Anderson's only knowledge about attempts to keep dealers in line came from what someone else told him. The remainder of his testimony consisted of several instances in which he overheard or was told directly that one of the defendants or "the majors" were raising their prices. In some of these instances we do not know the identity of the informant or the source of his information. Putting aside the very significant hearsay factor, the messages appear to have pertained to price increasing decisions that already had been made. As far as I can determine, Mr. Anderson has given no testimony that provides any competent factual support whatever to an inference of collusion in arriving at such decisions.

The last four sentences immediately above also apply to what Florida presents as being the testimony of Mr. Gervin and Mr. Cavin. This is true apart from the fact that both of these men now challenge the validity of the statements that Florida seeks to impute to them.

Another witness upon whom the plaintiffs relied initially is a Mr. Galligan, who has been exhaustively deposed. Most of his testimony is either irrelevant or immaterial to any issue here concerned; and most also is hearsay. Mr. Galligan did make allegations about a huge oil conspiracy, but the factual comments that might be considered pertinent are very general, fragmentary, uncertain as to time, and pertain principally to his relationships with independents. His conduct during his deposition in Florida was so unstable that, at the request of the parties, I sent a special master to preside. This move proved inadequate and, pursuant to a further request

of counsel, I went, myself, in order to complete the deposition. Mr. Galligan's credibility has been challenged by every other relevant witness, including lead counsel for Florida, the latter having expressed the intention not to use his testimony.

I do not know the present views of the plaintiffs concerning the help that they expect from Mr. Galligan, but it would be intolerable to require the parties to endure the burden of a trial on the strength of what this substantially discredited witness might have to say. *See Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 344 (9th Cir.1983); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975).

### B. *Conclusion Regarding Alleged Conspiracy To Have Simultaneous Restorations.*

The plaintiffs' chart pertaining to Los Angeles shows that between July 1971, the beginning of the period of limitations, and August 1972, when prices were stabilized by price controls, there occurred more than twenty separate price restorations. To accomplish restorations of this kind by means of conspiracy among so many companies would necessarily involve large numbers of people. It seems almost inevitable that there would be some documentary reference to at least one of these conspiratorial agreements, or that at least one witness would find himself obliged to acknowledge its existence. However, there is no sign of a paper trail pointing to a conspiracy, and the taking of more than four hundred depositions has failed to produce any testimony disclosing knowledge of collusive action in setting or changing wholesale prices.

On the contrary, there is voluminous evidence, through documents and depositions, that there was dynamic and vigorous competition among the defendants with respect to their sales of gasoline. The prices charged by the defendants did, indeed, remain similar, even in times of rapid change. However, the record shows that this is to be expected where, as here, the products are fungible and competition is intense. When prices were low, the defendants watched each other carefully and with considerable uncertainty and anxiety in order to detect any upward movement. When one of them made a restoration, the others pondered for themselves whether or not to follow and made their determinations pursuant to their individual self-interests.

In *Matsushita Electric Industrial Co. Ltd., et al. v. Zenith Radio Corp., et al.*, —— U.S. ——, ——, 106 S.Ct. 1348, 1353, 89 L.Ed.2d 538 (1986), the Supreme Court reversed the Court of Appeals for having reversed Judge Becker's grant of summary judgment to the defendants, the opinion of the Court by Justice Powell stating: "The Court apparently did not consider whether it was as plausible to conclude that petitioners' price cutting behavior was independent and not conspiratorial." In this case, it is thoroughly plausible to conclude that the behavior of each of the defendants in fixing and changing their respective wholesale prices of gasoline was independent and not conspiratorial.

### C. *Prompt Disclosure Of Restoration Decisions As Antitrust Violations.*

Thus far in this memorandum, I have written under the assumption that the defendants are charged with having conspired to act together in their restorations of tank wagon prices. As did the defendants, I have sought to understand and dispose of as many of the arguments submitted in support of such position as I reasonably could accomplish. However, on page 67 of their original brief in opposition to the defendants' summary judgment motions, the plaintiffs appear to recede from their initial contention:

"Plaintiffs do not contend that restorations were prearranged among all defendants to occur at a specific time. Plaintiffs do contend that defendants had a communications network that allowed them to 'confirm' each other's price changes in advance of uncertain field reports or published observations, so that full cooperation in the elimination of competition could be assured and so that defendants would know who if anyone was cheating on the restoration."

This apparently is an acknowledgement that the "leader" of a restoration did so pursuant to its own independent decision, and a claim that the antitrust conduct was in facilitating prompt knowledge of such action to all concerned, particularly the other defendants.

The plaintiffs rely greatly upon *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). That case found an antitrust violation in an agreement among competitors to furnish to each other, upon request, non-public information as to "the most recent price charged or quoted ... whenever it was not available from another source." (393 U.S. at 335, 89 S.Ct. at 511.) According to the concurring opinion of Justice Fortas, the exchange of such information had made it possible for individual defendants to submit bids to a particular customer that would quote the same price. Nothing in *Container* makes it illegal to publish a price change as soon as the decision has been made, and which inevitably, and before long, would become public knowledge.

A comment highly relevant to the present litigation is contained in the opinion of the Court by Justice Stone in *Maple Flooring Mfrs. Assoc. v. United States*, 268 U.S. 563, 582–584, 45 S.Ct. 578, 584–85, 69 L.Ed. 1093 (1925):

"It is the consensus of opinion of economists and of many of the most important agencies of Government that the public interest is served by the gathering and dissemination, in the widest possible manner, of information with respect to ... prices in actual sales, of market commodities, because the making available of such information tends to stabilize trade and industry, to produce fairer price levels, and to avoid the waste which inevitably attends the unintelligent conduct of economic enterprise. Free competition means a free and open market among both buyers and sellers for the sale and distribution of commodities. Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowl-

edge of all the essential factors entering into the commercial transaction.

\* \* \* \* \* \*

[T]he Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information. Sellers of any commodity who guide the daily conduct of their business on the basis of market reports would hardly be deemed to be conspirators engaged in restraint of interstate commerce."

The opinion in *Container* distinguished *Maple Flooring* on its facts, but in no sense did it challenge the foregoing statement. In *United States v. United States Gypsum Co.*, 438 U.S. 422, 441, n. 16, 98 S.Ct. 2864, 2875, n. 16, 57 L.Ed.2d 854 (1978), reference was made to *Container* as being in harmony with the proposition that the exchange of price information is not necessarily anticompetitive and that in proper circumstances it can "increase economic efficiency and render markets more, rather than less, competitive." *See also Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1360 (9th Cir.1976).

It seems to me that when one of the defendants was tired of a price war and decided to take a chance and raise its prices, it would be entitled to proclaim its decision immediately and loudly in the hope that the industry would follow promptly and not leave it alone in an above the market position. I also believe it to be in the other competitors' legitimate individual interests for them to learn of the upward move as soon as possible, in order that they might decide for themselves what action to take in light thereof. Nothing in the foregoing cases holds that, once a decision to increase a price has been made, the interested parties are precluded from immediately announcing it or learning of it.

However, regardless of my own views in this respect, after the *Container* decision was rendered in 1969, the defendants became "gun shy" about exchanging pricing information among themselves. The plaintiffs have shown some hearsay documentation from which it can be inferred that in some instances a representative of a defendant informed or acknowledged directly

to a representative of a competitor that the former's employer had decided upon a price change. However, the record is devoid of any evidence of a mutual plan or scheme or conspiracy that such information would be exchanged directly. The plaintiffs apparently recognize this lack, and they suggest, instead, that the defendants conspired to find less direct and more subtle ways of making sure that they learned promptly of an impending restoration.

1. *Use Of Dealers And Jobbers To Communicate Price Information.* The plaintiffs contend that "Defendants ... used one another's dealers and jobbers to communicate price information." (Plaintiffs' brief in opposition, page 34.) It is true that the defendants usually informed their respective dealers of a price increase a day or two before the effective date. This practice was fully justified as a matter of courtesy to the dealers so that they could determine what adjustments to make in their retail prices and change their posted signs accordingly. The record also shows that representatives of competing defendants sometimes learned of the impending wholesale price changes by making inquiries of the dealers. However, there is no evidence of a systematic relaying of such information.

2. *Public Posting Of Current Prices.* Some of the defendants regularly posted their tank wagon prices; some did not. The plaintiffs' information is that Texaco, Gulf and Shell were in the latter category. (Plaintiffs' Pretrial Brief, paragraphs 4–260–262.) The defendants say that those who posted did so for the information of their employees and their customers, and as a means of assuring their dealers that "there was no discriminatory pricing." In addition, at least one defendant's representative acknowledged that a further reason for posting was that he "wanted the competition to know what the price move was." (Plaintiffs' Pretrial Brief, paragraph 4–295.) It seems obvious that each of these reasons for posting was in the legitimate individual interest of the poster.

3. *Use Of Press To Inform Of Price Moves.* The plaintiffs assert the "infer-

ence" that the "[T]rade press was used as a proxy or replacement for direct employee communications concerning future marketing and pricing plans." (Plaintiffs' Pretrial Brief, ¶ 4–698.) The petroleum trade press, particularly Platts' Oilgram, quite naturally was and is interested in current and prospective prices of gasoline. Its reporters were active in obtaining evidence of any restorations and made frequent inquiries of representatives of the defendants seeking information or confirmation concerning what they had learned or suspected. It also appears that, in the course of doing so, they occasionally volunteered information about impending price moves. However, there is no indication that the reporters were acting for or under the direction of the defendants, or any of them, as conduits for exchanges of information concerning price changes that were contemplated but not yet decided upon.

The defendants handled press inquiries in different ways. Some of the defendants regularly announced their prices publicly and informed the press accordingly; some authorized their employees to answer press inquiries concerning pricing decisions already made; others did not talk to the press at all.

4. *Posted Prices At Defendant Owned Gasoline Stations.* The plaintiffs headed one section of their initial Pretrial Brief (Section IV, A, 3, a, ii) with the assertion that "The posting of retail prices at company operated service stations facilitated the conspirators' understanding of the retail price desired by the market leader and provided a means of visually signaling commitment to the agreed-upon retail prices, and verification of price moves." The paragraphs under that heading make two general assertions:

(a) The various defendants posted at their company owned stations the prices that they wanted their dealers to charge; and,

(b) The defendants kept track of each other's dealers' allowances by monitoring the prices posted at the company owned stations.

As to the first assertion, I do not see how a defendant could operate a retail gasoline station without posting the prices that it is charging. Certainly, the inference of independent action is overwhelming as compared to an inference of conspiracy. See the quotation from *Matsushita Electric Industrial Co. Ltd., et al., v. Zenith Radio Corp., et al.,* —— U.S. ——, ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986), which is set out at page 3 of this memorandum. The second assertion portrays active competition and contains no basis for an inference of conspiracy.

### D. *Conclusion Regarding Prompt Disclosure Of Restorations.*

It was in the legitimate interest of each defendant that knowledge of its price increases, once determined upon, reach its competitors promptly. In any event, there is no evidence of a mutual agreement by the defendants to exchange such information, directly or indirectly, in advance of its availability to the public. Any steps taken by a defendant to announce its price changes were accomplished in ways that it determined to be in its individual self interest.

### E. *Florida's Contentions Regarding Price Fixing.*

Florida's memoranda and oral arguments at the hearing for the most part "track" those of the other plaintiffs. Florida does add many summaries of depositions, all of which I have examined. I think it fair to characterize such material as something of a hodgepodge, which neither individually nor collectively constitutes admissible evidence indicating a conspiracy on the part of the defendants to fix prices. Much of the testimony consists of hearsay statements reporting that the dealers' allowances by one or more of the defendants "had been or were going to be withdrawn." I believe that in none of these instances do we know the ultimate source of such information, and the likelihood is that it pertains to restorations already decided upon and perhaps even announced. There is no indication of collusion in arriving at a decision by a particular defendant to restore, or of any

mutual determination in advance that others would follow.

There is testimony about efforts to persuade the "independents" to stabilize their prices upward. Most of the deponents could only place these efforts to have occurred sometime between 1966 and 1978, and Florida's principal witness in this area, Mr. Gervin, contended that his last contact with the "majors" was in 1969. Florida carefully has sought to blur the distinction between pre-*Container* (1969) and post-*Container* events, and to place the "evidence" upon which it relies within the latter period. A rather disturbing example of such efforts involved the testimony of Mr. Roy Graham, who was a retail service station supervisor for an independent marketer. Florida undertakes to quote his testimony concerning telephone conversations that he had with a Mr. Dervaes, who apparently was affiliated with one of the other independents. According to Mr. Graham, the two men in these conversations would ask each other to help in getting the independents to increase their prices. (See Florida's General Response to Defendants' Summary Judgment Motions on Price-fixing and Conspiracy, pages 19–20.) At the top of page 20, Florida sets out a question and answer as follows:

"Q I believe you said that Mr. Dervaes called you on occasions during the *1973 time period;* is that correct?

A Yes." (Emphasis supplied.)

However, at the oral argument, defense counsel pointed out that the transcript of Mr. Graham's deposition reads:

"Q I believe you said that Mr. Dervaes called you on occasions during the *1968 to 1973 time period;* is that correct?

A Yes." (Emphasis supplied.)

Florida's distortion of the record was compounded at the oral argument when its counsel said "... and I would like to correct Mr. Destino [counsel for one of the defendants] here [!!]. It is quite clear—we went back and checked on pages 85–87 of the Graham testimony. It says 1968 to 1973 time period that the man is talking about." (Transcript pages 599–600.) This assertion must be compared with Mr. Gra-

ham's testimony that he could not recall having had any conversation with Mr. Dervaes after 1969. (Graham deposition transcript page 115.)

In another troubling example, Florida summarizes testimony of Mr. Winn Hobbs, a Phillips employee:

"Hobbs testified further that although the executive director of the Florida Petroleum Council advised the members not to discuss prices at the meetings, to his recollection *Sun was the only company that would not discuss prices.*" (Florida memorandum, page 44.) (Emphasis supplied.)

I have read all of the portions of the deposition of Mr. Hobbs that Florida listed as being the bases for the above assertion. Nowhere therein was there any reference to Sun being the only company that would not discuss prices. In fact, at page 95 of the transcript of Mr. Hobbs' deposition, the following appears:

"A. What I was trying to point out to this gentleman that interviewed me was that at these meetings price, which no company representative was discussed [sic], nor was it on the agenda. And I tried to emphasize by making the comment that Sun had a record that they wouldn't talk to anybody. They—I'm merely trying to put over to this gentleman that at these meetings in no way was price discussed. And I merely used Sun as an example. There were some others that were the same way. Just everybody. We didn't discuss price in these meetings. We didn't discuss price anywhere in these meetings."

As is indicated above, I have found nothing in Florida's voluminous brief that gives substantial support to its contention of conspiracy by the defendants to raise prices. But even if there is something that I have missed, the foregoing examples raise a grave question as to the credence that may be given to the statements contained in Florida's memorandum.

## II. THE ALLEGED CONSPIRACY TO CREATE SHORTAGES OF PETROLEUM PRODUCTS.

The plaintiffs contend that in 1972 and 1973 the defendants conspired to contrive a nationwide shortage of petroleum products. The alleged purpose of such shortage was to enable them to stop selling to the independents, and thus end the price wars. According to the plaintiffs, the defendants agreed to accomplish the shortage by reducing their respective domestic productions of crude oil, curtail their plans for building additional refining capacity, make unnecessary allocations of inventories and production that would eliminate sales to independents, and hold down production of crude oil in Iran and Saudi Arabia. The evidence presented to the court in support of and in opposition to these contentions is summarized below.

### A. Suggestions To Hold Down Production And Refining Capacity.

In 1970 and 1971 several of the defendants had more crude oil production and refining capacity than they needed in order to supply gasoline to their regular customers and company owned stations. They accordingly sold the "surplus" to independents. The files of several of the defendants contained in-house memoranda that expressed dissatisfaction with the practice by their respective employers of producing so much gasoline that they were obliged to sell the surplus to independents, who, in return, competed with the sellers at reduced prices. As the plaintiffs pointed out in their Initial Pretrial Brief (¶ 8–200), "Gulf management observed in October 1971 that 'an alternative to selling surplus gasoline is not making it, which might be a wiser course.'" Employees of another defendant proposed to management that the company postpone expanding its refining capacity until a need therefor had been observed for two years. In the meantime, any requirement for more oil or more refining capacity could be fulfilled by purchase and by entering into processing agreements with other companies.

### B. Other Factors That Discouraged The Building Of New Refineries.

Lack of enthusiasm for producing gasoline that would be sold to price cutting

independents was not the only factor that discouraged refinery expansion:

1. The costs of building a refinery were increasing rapidly.

2. A site for a refinery was difficult to find, because of environmental considerations and the litigation seeking to enjoin construction that such considerations inspired.

3. Uncertainty as to the continued availability of crude oil from domestic, Alaskan, and foreign production raised questions in 1971 and 1972 as to the need for additional refining capacity.

4. Price controls reduced the profitability of sales of oil products and tended to discourage expansion.

### C. *Production Of Crude Oil In the Middle East.*

Some of the defendants, with the approval of the Government of the United States, participated in joint ventures to produce crude oil in Iran and in Saudi Arabia. For reasons set out in a memorandum of decision filed March 2, 1982, I held that the fact that some of the defendants entered into these consortiums did not provide support for this antitrust action. I did, however, allow the plaintiffs some further discovery in order that they might "make reasonable inquiry as to whether the limits on oil production in Iran and Saudi Arabia stemmed from ... anticompetitive agreements to increase prices in the United States by holding down imports from those countries." (Memorandum of Decision, March 2, 1982, pages 10–11.) Nothing subsequently has been called to my attention that would indicate that there were any such "anticompetitive agreements." In fact, at the hearing on the motions here concerned the plaintiffs' counsel took the position that it makes no difference whether any less than maximum production of Middle East oil stemmed from an antitrust conspiracy to create a shortage or occurred simply because the participating defendant producers guessed wrong as to their needs. According to the plaintiffs' counsel, the defendants "were acting in a cartel and ... the cartel did not produce the output that

was necessary," and liability therefore follows. (Transcript page 241.)

This court cannot accept such a contention. It now appears beyond dispute that the operations under both consortiums were in accord with the agreements approved by the Attorney General of the United States. Under such circumstances, as I said in the Memorandum of March 2, 1982, at page 7, "I cannot conceive of this court allowing them [the consortiums] to form a basis for recovery in the present legal actions."

### D. *The Onset Of The Shortage And Some Reasons Therefor.*

In the latter part of 1972 and throughout most of 1973, there was, indeed, a shortage of gasoline in this country. There are several reasons for such shortage apart from anything that the defendants may or may not have done:

1. The economy of the country was healthy and people were driving more.

2. Increasing numbers of autos had air conditioning and "power" operated equipment, which increased gasoline consumption.

3. Antipollution requirements obliged automobile engines to accept low-lead gasoline, which reduced substantially the miles per gallon that the engines could accomplish.

4. The winter of 1972–73 was unusually severe, requiring diversion of production from gasoline to fuel oil.

5. Although, as noted above, price controls tended to discourage increases in supply, the resulting lower prices enhanced demand.

### E. *The Responsibility Of The Defendants For The Shortage.*

It is obvious that another reason for the shortage was the failure of the defendants to anticipate the increased demand for gasoline in 1972 and 1973 and to prepare adequately to meet it. However, a considerable amount of time is necessarily involved between a decision that a new refinery is

needed and bringing it on stream, and the evidence points up the difficulty in striking a balance between too much production and not enough. The evidence submitted also shows quite clearly that whatever the defendants did or did not do stemmed from individual decisions rather than conspiracy.

There is no indication of a mutual agreement to create a shortage of gasoline or to freeze out the independent dealers. Some of the defendants built new refineries, others enlarged existing refineries, and still others did close certain refineries. The plaintiffs acknowledge in their Initial Pretrial Brief (¶¶ 7–1 and 7–2) that by August 1972 U.S. production had reached its peak. Thereafter, production steadily increased. According to the Bureau of Mines, overall production in each month of 1972 substantially exceeded production during the corresponding month of the prior year, except for November and December, when the Arab oil embargo was in effect.

The plaintiffs assert that statistics that show constantly increasing production "prove nothing if these expansion programs were collusively geared to lag behind increased demand or were altered in defendants' common interest." (Plaintiffs' Brief in Opposition, page 139.) The problem for the plaintiffs is that they have presented no creditable evidence to show any such collusion.

During the period of shortage, some of the defendants continued to serve the independents with whom they had been dealing; others curtailed or discontinued sales to independents. But, here again, as far as can be determined from the submissions made, whatever was done stemmed from individual decision and was without any reference to what others were doing.

### F. *Conclusion Regarding Alleged Conspiracy To Create Shortages Of Petroleum Products.*

■ The shortage in 1972 and 1973 was real. It was caused principally by increased demands for gasoline, which were beyond the control of the defendants. It also was caused by the understandable failure of the defendants to anticipate the increased demands and prepare to meet them before shortages occurred. Whatever the causal relationships that any of the defendants may have had with the shortages, they stemmed from individual action or lack of action and not from any conspiracy.

### III. THE ALLEGED CONSPIRACY NOT TO COMPETE IN BIDDING FOR CONTRACTS WITH STATES AND THEIR GOVERNMENTAL SUBDIVISIONS.

■ The plaintiffs charge that the defendants entered into a conspiracy under which they would refrain from competing with each other for contracts for the sale of petroleum products to the plaintiff States and their subdivisions. Little need be said in disposing of this contention. The plaintiffs cite no evidence, either oral or written, of a communication between any defendant's employee and any competitor relating to bid practices.

The record shows instances in which one defendant did bid successfully to supplant another in selling to an agency of a plaintiff State. On other occasions, a defendant did not seek a contract because State bid specifications made it ineligible. In still other instances, a defendant did not bid because, for one reason or another, it found the potential contract not to be desirable to it. But the plaintiffs have shown no pattern of a failure to bid from which a conspiracy can be inferred, particularly in light of the many reasons why contracts to sell to State entities are of marginal desirability, as the plaintiffs have acknowledged.

### IV. CONCLUSION

From the outset of this litigation, instances have occurred that have caused me to wonder how the plaintiffs were going to prove their case. In the course of the years that followed, my concern gradually shifted toward the question of whether the plaintiffs were developing evidence with which they *could* prove their case. And now, after more than ten years and great expenditure of effort and money by all concerned, it has become evident that the plaintiffs simply cannot establish any part

of the conspiracy that they allege. All that the plaintiffs present are the self serving inferences drawn from facts that are far from compelling a conclusion of conspiracy. Such facts are at least as consistent with a finding of individual action and vigorous competition. Under the teachings of *Zenith* (see pages 1297–1298 hereof), summary judgment is required and accordingly will be granted to the defendants.