| | | |
|---|---|---|
| $450,175.00 | — | Contract retainage held by Marriott |
| + $ 64,811.68 | — | Marriott owes McDevitt (Proposal No. 10) |
| $514,986.68 | — | Total owed to McDevitt by Marriott |
| − $416,823.00 | — | McDevitt owes Marriott for breach |
| $ 98,163.68 | — | GRAND TOTAL OWED MCDEVITT BY MARRIOTT |

**STEPHEN JAY PHOTOGRAPHY, LTD., Larry LeMasters, Robert G. Holman and Kitty L. Pugh, Plaintiffs,**

v.

**OLAN MILLS, INC., Olan Mills Incorporated of Tennessee, and Kinder–Care, Inc., Defendants.**

Civ. A. No. 88–690–N.

United States District Court, E.D. Virginia, Norfolk Division.

May 8, 1989.

William P. Williams, Evans, Williams & Levinson, Virginia Beach, Va., for plaintiffs.

Conrad M. Shumadine, Walter D. Kelley, Jr., Gary A. Bryant, Willcox & Savage, Norfolk, Va., for Olan Mills.

William T. Prince, Richard W. Swope, Williams, Worrell, Kelly & Greer, Norfolk, Va., for Kinder–Care, Inc.

## AMENDED MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

This matter comes before the Court on a Motion for Summary Judgment filed by the defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs have responded, the parties have been heard orally, and therefore the Motion is ripe for disposition.

This action was originally filed in the Circuit Court of the City of Norfolk, Virginia, seeking damages and injunctive relief for violations of the Virginia Antitrust Act, §§ 59.1, *et seq.* of the Code of Virginia. The action was removed to this Court pursuant to 28 U.S.C. § 1441. Plaintiffs then amended their Complaint to join four additional counts alleging violations of the federal antitrust laws. Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and a Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. By Memorandum Opinion and Order dated January 19, 1989, the Court dismissed plaintiffs' tying claims (Counts II and VI) as well as plaintiffs' claims under Section 2(a) of the Robinson–Patman Act (Counts III and VII). The Court also permitted plaintiffs to reamend their Complaint to allege an adverse effect on competition with respect to their conspiracy claims. The defendants seek sum-

mary judgment on plaintiffs' remaining counts which allege violations of Section 2(c) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. § 13(c), and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Because the pertinent Virginia Antitrust Act provisions use language virtually identical to their federal counterparts, the state act must "be applied and construed to effectuate its general purposes in harmony with judicial interpretations of comparable federal statutory provisions." Va.Code § 59.1–9.17. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 353 (4th Cir.1983), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *Net Realty Holding Trust v. Franconia Properties, Inc.*, 544 F.Supp. 759, 767 n. 10 (E.D. Va.1982).

The plaintiffs in this case are local photography studios engaged in the business of selling photographs and photographic portraits. The defendants Olan Mills, Inc. (Olan Mills) and Kinder–Care, Inc. (Kinder–Care) are competitors of plaintiffs. The relevant market as defined by plaintiffs is the sale of photographs and photographic portraits to public high school students in the cities of Norfolk, Portsmouth, Chesapeake and Virginia Beach during the period from January 1, 1985 to the present. (Complaint ¶ 2). The gist of plaintiffs' Complaint is that defendants have unlawfully cornered the relevant market through the use of exclusive dealing contracts with public high school officials.

Under these exclusive dealing contracts, the defendant photographers produce photographs, suitable for publication in the school yearbook, free of charge in exchange for the school's endorsement as the "official photographer." The parties agree that the school's endorsement as the "official photographer" is invaluable because it provides the photographer with a large number of customers likely to purchase additional photographs or portraits. As part of this agreement, the official photographers pay the school a commission on each additional photograph or portrait sold. These commissions range from approximately 20 percent for senior portrait sales to 40 to 50 percent for underclass picture sales. The commission payments are used by the schools on official school projects and activities, including the publication of the yearbook. (Tarr Aff. ¶ 3; Williams Aff. ¶ 3; Gilbert Aff. ¶ 4; Owens Aff. ¶ 3). The plaintiffs do not contend, nor does the record suggest, that the commission payments are made to school officials individually. The plaintiffs characterize these commissions as "kickbacks" and argue that they are used as an inducement to enter the exclusive dealing contract with the defendants and that the commission payments are not commensurate with the services rendered by the schools.

The plaintiffs argue that the defendants and various school officials have unfairly influenced students and parents to use the services of the contract photographer. The record reveals that the contract photographer, and often the schools themselves, send letters to students and parents to inform them that defendants are the "official" contract photographer. (Plaintiffs' Book III, Ex. 21, 32, 34, 38, 40, 41, 44, 46, 50; Plaintiffs' Book IV, Ex. 17, 18, 19). These letters explain the contractual arrangement between the contract photographer and the school, and explicitly disclose that a commission payment is made to the schools by the photographer. While the letters do not state that it is mandatory that a student's picture be taken by a contract photographer, the letters strongly encourage using the contract photographer as a means of supporting the school. Some of the letters specifically inform students that they are not obligated to purchase from the contract photographer. (Plaintiffs' Book III, Ex. 21; Plaintiffs' Book IV, Ex. 17, 18, 19). The plaintiffs argue that these letters are false and misleading because the letters assert that defendants' photographic work is superior to others, and because the amount of the commission paid to the schools is not revealed. (Blancett Dep. at 62; Knox Dep. at 10–11). The plaintiffs further argue that various school officials have exercised undue influence over students and parents by refusing, or

threatening to refuse, photographs from noncontract photographers. (Friedman Aff. ¶ 4; Holman–Pugh Aff. ¶ 4; LeMasters Aff. ¶ 4). The plaintiffs also argue that defendants and school officials have conspired to deny them access to the photography bidding and negotiation procedure, and that in furtherance of this conspiracy, defendants and school officials have refused to supply plaintiffs with photo specifications, refused to publish yearbook advertisements for plaintiffs, and assessed a penalty fee against students who submit photographs from noncontract photographers. (Friedman Aff. ¶ 2, 3, 6; Holman–Pugh Aff. ¶ 2, 3, 6; LeMasters Aff. ¶ 2, 3, 6).

Finally, plaintiffs argue that the services provided by the schools are not proportionate to the amount of the commissions paid. The record reveals that the schools do provide some services to the photographer, such as assisting in bookkeeping, money collection and in setting up studio space. (Atkinson Aff. ¶ 4; Gilbert Aff. ¶ 6; Hale Aff. ¶ 5; Newlog Aff. ¶ 5). At oral argument, counsel for Olan Mills conceded that the commission amount was not proportionate to these logistical services, but that the schools provide a valuable service by providing defendants access to a large number of potential customers.

### Robinson–Patman Act

■ Plaintiffs allege that the commissions paid by the defendants to the schools constitute "commercial bribery" within the reach of Section 1(c) of the Robinson–Patman Act. The pertinent provision of the Act alleged to have been violated in this case provides:

(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermedi-

ary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c). A number of courts have found that Section 13(c) prohibits commercial bribery when suppliers have paid consideration to intermediaries of buyers in order to obtain the buyer's business, and such payment was obtained by the intermediary for its own use. *See, FTC v. Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *Grace v. E.J. Kozin Co.,* 538 F.2d 170 (7th Cir.1976); *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851 (9th Cir.1965); *Fitch v. Kentucky–Tennessee Light & Power Co.,* 136 F.2d 12 (6th Cir.1943); *Burch v. Goodyear Tire & Rubber Co.,* 420 F.Supp. 82 (D.Md. 1976), *aff'd on other grounds,* 554 F.2d 633 (4th Cir.1977). *But cf., Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367 (3d Cir.1985) (declining to take issue with commercial bribery cases, but noting "[t]here is good reason to question whether Congress intended to sweep commercial bribery within the ambit of Section 2(c)").

The Virginia Attorney General has twice addressed the issue of whether a commission payment by a contract photographer to a school constitutes commercial bribery within the meaning of Section 59.1–9.7(c) of the Code of Virginia, the state counterpart to Section 13(c) of the Robinson–Patman Act. *See,* 1982–83 *Op.Va.Att'y Gen.,* 411; 1976 *Op.Va.Att'y Gen.,* 229. In both opinions, the Attorney General found that the school acts as an "intermediary" on behalf of the students and their parents, the ultimate buyers of defendants' products. The Attorney General further found that the school, represented by its principal or other responsible party, is under a duty to act in the best interests of the purchasers, and accordingly must select the supplier with the highest quality service at the lowest price. 1976 *Op.Va.Att'y Gen.,* 229, 231. *See,* Va.Code § 11–35 *et seq.* (stating the Commonwealth's policy that public bodies should strive for high quality and reasonable costs.) In its 1976 opinion, the Attor-

ney General found any payment made to a school to influence its choice of supplier violates Section 13(c). In its 1982 opinion, the Attorney General concluded that because no agency or fiduciary relationship exists between the school and the students and parents, there is no duty to make written disclosure. The Attorney General's ultimate conclusion was that the illegality of this contractual arrangement is not cured by the voluntary disclosure of the commission payment, combined with disclosure of the fact that the student was not obligated to use the contract photographer.

The Court agrees with the Attorney General's finding that the schools act as intermediaries for the students and parents. The Court disagrees, however, with the Attorney General's conclusion that the contractual arrangement at issue constitutes commercial bribery. Because secrecy is an essential element of Section 13(c) commercial bribery, the contractual arrangement at issue here is not illegal. *See, Burge v. Bryant Public School District,* 520 F.Supp. 328 (E.D.Ark.1980), *aff'd per curiam,* 658 F.2d 611 (8th Cir.1981); *Rangen Inc. v. Sterling Nelson & Sons,* 351 F.2d 851 (9th Cir.1965); Letter from FTC Bureau of Competition to Maritz, Inc. (June 21, 1984), *reported in* 47 Antitrust & Trade Reg. Rep. (BNA) 16. The Court finds that when a buyer is expressly notified that his intermediary or agent is accepting a commission from the seller, and the buyer is not prevented from learning the amount of the commission given, the payment will not constitute commercial bribery.

In *Burge v. Bryant Public School District,* a federal district court addressed the commercial bribery issue in a similar factual setting. In *Burge,* the plaintiff alleged that the defendant school district violated Section 13(c) by requiring the successful bidder on the school photography contract to pay the school district a ten percent commission based on the purchase orders of the students. The district court noted that commercial bribery primarily involves "a situation where the buyer's agent secretly accepts some sort of bribe in return for seeing to it that the bribing party receives the business of the agent's buyer."

*Burge,* 520 F.Supp. at 333. The court in *Burge* found that there were no secret dealings because the school district's manner of soliciting bids and purchasing photographs was a matter of public record.

The importance of the secrecy element in the commercial bribery context is further demonstrated by the Ninth Circuit's decision in *Rangen Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851 (9th Cir.1965). In *Rangen,* a manufacturer of fish food brought an action pursuant to Section 13(c) asserting that a competitor bribed an official of the State of Idaho to prefer the competitor's products. Defendant Rangen and plaintiff Nelson were competitors in the production and sale of fish food. Defendant Rangen made an undisclosed payment to Elwood Grimes who used his influence with responsible state officials to ensure that the state purchased substantially all of its fish food from Rangen. At various times during the period in question, plaintiff Nelson contacted James Simpson, Chief of Fisheries Management for Idaho's Department of Fish and Game (and Grimes's principle), in an effort to sell fish food to the state. Simpson refused Nelson's offers as Rangen was, with insignificant exceptions, the sole supplier of fish food. The trial court found that defendant Rangen's conduct constituted commercial bribery because none of the payments from Rangen (seller) to Grimes (buyer's agent) were disclosed to any other employee of the state. The trial court also found that Grimes did influence the responsible state officials to purchase their food food from Rangen. Finally, the evidence showed that as a proximate cause of the conduct of Rangen and Grimes, plaintiff Nelson was deprived of the opportunity to bid on the contract in question.

The *Rangen* case is factually similar to the case at bar in that the plaintiffs have chosen to sue a competitor who made payments to the buyer's agents. The *Rangen* court found that the competitor's conduct constituted commercial bribery because the payments were never disclosed to the buyer. The *Burge* case is distinguishable from *Rangen* and the case at bar because the

defendant in *Burge* was not a competitor, but the buyer's agent (the school district). Thus, the district court in *Burge* was not concerned with disclosure to the students or parents (buyers), but instead with the openness of the defendant school district's bidding procedure. Accordingly, the school district's bidding procedure in the instant case is not at issue with respect to the commercial bribery claim. The bidding procedure would be relevant to plaintiffs' Section 1 conspiracy claim in that an agreement between a buyer's agent and a seller to prefer one competitor over another could effectively restrain trade.

The Court finds that in the case at bar, the letters sent to the students and parents by either the contract photographer or the school fully disclose that a commission is paid by the defendants to the school. Thus, the requisite element of secrecy is lacking. While these letters encourage, and may influence, the students or parents to purchase additional photographs from the contract photographer, the school's interests in promoting the contract photographer is fully disclosed in the letters. The plaintiffs have alleged that certain school officials have exercised improper influence over students and parents by refusing, or threatening to refuse, photographs from noncontract photographers. The Court finds, however, that the use of influence, even improper influence, would not violate Section 13(c) when the commission payments are disclosed to the buyer. A contrary finding would result in the imposition of vicarious liability upon the seller for the conduct of the buyer's agent or intermediary. While the use of improper influence may not violate Section 13(c), it may be relevant to a claim alleging a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.

### Services Rendered Exception

Plaintiffs argue that the school district does not provide services to the defendant photographers commensurate with the commissions paid. The pertinent exception to the Robinson–Patman Act provides that "it shall be unlawful for any person engaged in commerce ... to pay or grant, or to receive or accept, anything of value as a commission, ... *except for services rendered* in connection with the sale or purchase of goods...." 15 U.S.C. § 13(a) (emphasis added). The plaintiffs rely upon the Virginia Attorney General Opinions which hold that the commission should be a *bona fide* approximation or reasonably related to the costs of services rendered by the intermediary. *See,* 1982–83 *Op.Va.Att'y Gen.* 411, 413; 1976 *Op.Va.Att'y Gen.* 229, 231. The defendants rely upon the *Burge* decision wherein the district court found that a school district rendered valuable services by assisting in organizing the photography shooting schedule, assisting in bookkeeping, collecting monies and setting up studio space. *Burge,* 520 F.Supp. at 333. The *Burge* court held that, "The consideration given by the photographers in exchange for the services rendered by the school district is of course a matter of contract law and a matter of bargaining between two parties...." *Id.* The Eighth Circuit affirmed the district court solely on its holding that services were rendered by the school district in exchange for the commission received. *Burge,* 658 F.2d at 612 The Court of Appeals found that the services rendered were not merely de minimis, but were valuable to the photographer in connection with the sale and purchase of photographs.

In the instant case, the record reveals that the schools provide services to the defendant photographers similar to the services provided the photographers in *Burge:* organizing the shooting schedule, assisting in bookkeeping, money collection and setting up studio space. While the defendants concede that the commission payments are not proportionate to these logistical services, they argue that under *Burge* the services need not be proportionate, or alternatively that the schools provide a valuable service to defendants by supplying them with access to a large number of potential customers. This Court finds the reasoning applied in the *Burge* decision persuasive. Thus, as long as the services provided are more than de minimis, the consideration given by the photographers in exchange

for the services rendered is a matter of contract law. The Court finds that the schools in the case at bar have provided services sufficient to satisfy the exception.

Accordingly, plaintiffs' commercial bribery claims brought pursuant to Section 13(c) of the Robinson–Patman Act (Count III) and Section 59.1–9.7(c) of the Code of Virginia (Count VII) are DISMISSED with prejudice.

### Sherman Act—Section 1

■ The plaintiffs have alleged that the defendants and the schools, who are not defendants in this action, violated Section 1 of the Sherman Act, which prohibits any "contract, combination . . ., or conspiracy in restraint of trade." 15 U.S.C. § 1. Concerted activity is the essential element of plaintiffs' Section 1 conspiracy claims. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985). The Court initially notes that in order to survive a motion for summary judgment in an antitrust conspiracy case, a plaintiff must establish that there is a genuine issue of fact whether defendant entered into an illegal conspiracy. *Matsushida Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has met its responsibility of identifying the basis of its motion, the nonmovant must come forward with "specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Fourth Circuit has noted that, "conduct as consistent with permissible competition as with illegal conspiracy does not itself support an inference of antitrust conspiracy." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 102 (4th Cir.1987). The standard for summary judgment in antitrust conspiracy cases requires the nonmovant to present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." *Id.* The Supreme Court held that this standard requires "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

The plaintiffs in the instant case have alleged that the defendants have entered into two separate conspiracies: (1) between the defendant Olan Mills and defendant Kinder–Care and (2) between defendants Olan Mills and Kinder–Care, and the schools. With respect to the alleged conspiracy between the two defendants, the plaintiffs assert that defendants have engaged in illegal price fixing and horizontal market division. (Complaint ¶¶ 6G and 6J). Both price fixing and an agreement to allocate territories in order to minimize competition constitute *per se* violations of Section 1 of the Sherman Act. *See, United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal territorial limitations are *per se* violations); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (combination with purpose and effect of raising, depressing, fixing, pegging or stabilizing prices is illegal *per se* ). These agreements or practices, if proven, are conclusively presumed to be unreasonable and therefore unlawful because of their pernicious effect on competition and lack of redeeming virtue. *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

In support of their argument that defendants have conspired to fix prices, the plaintiffs note a memorandum from Jerry Blancett, territorial manager for Olan Mills, to Ed Cross (Plaintiff's Book IV Ex. 9). The memorandum states:

> Enclosed is a copy of our bid (prices only, I did not include resumes, statements of interest, etc.). Also you will find Max Ward and National quotes. Any questions please call.

> P.S. in reference to your letter—we would have to freeze senior prices and book prices for the three years. Should we get the entire bid we gonna have to negociate [sic] the 20% on the seniors and books!

At the very least, this memorandum demonstrates that Olan Mills had access to the

bid prices of Max Ward (the predecessor to Kinder–Care) and National Photography.

The plaintiffs argue that this sharing of pricing information has resulted in the stabilization of prices. The deposition testimony of Thomas Knox and Anna Marie Tarr reveal that the prices charged in the relevant market are fairly uniform. (Knox Dep. at 55–56; Tarr Dep. at 10). Mr. Knox further testified that while the prices charged are similar, the defendants compete over service, experience of the personnel, and the quality of samples and pricing information. Similarly, while Ms. Tarr acknowledged in her deposition that the prices charged in the relevant market are similar, she also noted in a letter dated August 23, 1985 to plaintiff Stephen Friedman (Plaintiff's Book III, Ex. 33) that Granby High School has continued using the services of Olan Mills because, "Their prices are competitive (and even lower than some, like you) with the local market, their quality is superior, and most of all, their commitment to Granby is outstanding." While the stabilization of prices in the relevant market may or may not be caused by price sharing, the record also reveals that defendants continue to compete on the basis of quality, service and commitment.

As the Court noted earlier, a conspiracy to fix prices is *per se* illegal because such conduct is without redeeming value and has an obvious adverse effect on competition. *Socony–Vacuum Oil*, 310 U.S. 150, 60 S.Ct. 811. The Supreme Court in *Maple Flooring Manufacturers Assn. v. United States*, 268 U.S. 563, 582–83, 45 S.Ct. 578, 584–85, 69 L.Ed. 1093 (1925), found, however, that Section 1 was not violated by the dissemination of cost data, notwithstanding an apparent stabilizing effect on price, where no intent to constrain competition was established. *See also, Sugar Institute, Inc. v. United States*, 297 U.S. 553, 598, 56 S.Ct. 629, 642, 80 L.Ed. 859 (1936); *Cement Manufacturers Protective Association v. United States*, 268 U.S. 588, 602–03, 45 S.Ct. 586, 591, 69 L.Ed. 1104 (1925). Moreover, the Supreme Court in *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975) explicitly held that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." This holding was reaffirmed by the Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978) wherein the court found that, "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." The Court in *United States Gypsum* also notes, however, that the exchange of price information has the greatest potential for generating anticompetitive effects. *Id.* The Court further noted that although such activity is not *per se* unlawful, it has been consistently found to be in violation of the Sherman Act. *Id. citing United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

In *Container Corp.*, there was an exchange of specific sales and price information among competitors but no agreement to adhere to a price schedule. *Id.* at 334, 89 S.Ct. at 511. The Court found that the industry was dominated by relatively few sellers, the product was fungible, the competition for sales was primarily through price, and the demand was inelastic, as buyers placed orders for immediate, short-run needs. *Id.* at 337, 89 S.Ct. at 512. The Court held that the inference was irresistible that the exchange of price information had an anticompetitive effect, chilling the vigor of price competition. *Id. See also, Flavo–O–Rich, Inc. v. North Carolina Milk Commission*, 593 F.Supp. 13, 15 (E.D.N.C.1983).

This Court finds that the *Container Corp.* case is distinguishable from the instant case and that exchange of price information has not restrained competition so as to violate Section 1 of the Sherman Act. The case at bar is similar to the *Container Corp.* case in that the relevant market is dominated by relatively few sellers and the demand for yearbook photos and senior portraits is inelastic. The *Container Corp.* case is distinguishable in that the

photographs are not fungible goods, and most importantly competition for sales is not primarily based upon price. As Mr. Knox's deposition testimony and Ms. Tarr's letter reveal, the quality of the photography, the experience of the personnel and the photographer's commitment to providing other services to the individual schools is a significant source of competition among the defendants and others in the high school photography market.[1] The existence of these factors as a basis for competition in the relevant market is supported by the numerous affidavits of the school officials. (Appendix to Defendants' Brief, Ex. 2 a-s), Because of the absence of a purpose or effect to restrain competition, or an agreement to restrain competition, the exchange of price information in this case does not offend Section 1 of the Sherman Act. *Continental Cablevision v. American Electric Power Co.*, 715 F.2d 1115, 1119 (6th Cir.1983). Accordingly, plaintiffs' price fixing claims are DISMISSED.

■ The plaintiffs have also alleged that the defendants have conspired to restrain trade by engaging in marketing division. (Plaintiffs' Complaint ¶ 6G). The Supreme Court in *Topco* found that "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is a classic example of a *per se* violation of Section 1. *Topco*, 405 U.S. at 608, 92 S.Ct. at 1133. Horizontal market allocation exists when there is an agreement among competitors which has the effect of eliminating competition in markets where, absent the agreement, they would otherwise compete. E. Kitner, *Federal Antitrust Law* § 10.42 (1983).

In support of their Motion for Summary Judgment, the defendants have submitted the affidavits of Jerry Lamar Blancett, territorial manager for Olan Mills, and James W. Saine, president of the Max Ward–Delmar Division of Kinder–Care. (Appendix to Defendants' Brief, Ex. 3 and 4). The Blancett and Saine affidavits deny territorial division of the relevant market. The plaintiffs argue that when defendant Kinder–Care was awarded the Chesapeake schools contract, the defendant Olan Mills abandoned all attempts to photograph Chesapeake students. (Plaintiffs' Brief at 20). The plaintiffs do not support this allegation with any evidence in the record. The defendants argue that Olan Mills has consistently bid on the Chesapeake contract and attached a copy of a bid application dated March 31, 1988. (Defendants' Reply Brief, Ex. D). The Court finds that even if plaintiffs had supplied evidence in support of their market allocation claim, the conduct as alleged does not exclude the possibility that Olan Mills and Kinder–Care acted independently. Plaintiffs have failed to satisfy the *Monsanto* summary judgment standard, and therefore their market allocation claims are DISMISSED.

■ The plaintiffs have also alleged that defendants have violated Section 1 by conspiring with school officials to restrain trade. (Plaintiffs' Amended Complaint ¶ 6A–K). Plaintiffs argue that the following acts constitute evidence of the alleged conspiracy between defendants and the schools: (1) plaintiffs have never been included in the schools' contract photography and bidding procedures; (2) plaintiffs have experienced difficulty in obtaining the photo specifications for senior yearbook photographs; (3) school officials have refused, or threatened to refuse, plaintiffs' photographs for inclusion in the yearbook; (4) the defendants and the schools send letters to parents and students which endorse the defendants as the "official" yearbook photographer and which suggest that only photographs from the defendants are acceptable; (5) defendants are allowed to advertise for free, while plaintiffs must pay full price; (6) the defendants provide the schools with senior composite photographs and faculty photographs free of charge; and (7) a penalty fee is assessed by the

---

**1.** The Chesapeake Public Schools Student School Pictures Specifications provide, "It should be noted that cost, although a significant factor, is secondary to quality of service and product and shall not be the sole determinant in selecting a school photographer and/or photograph studio." (Plaintiffs' Book III, Ex. 14).

schools against photos submitted by non-contract photographs. For purposes of this Motion, the Court will consider plaintiffs' allegations as true. Nevertheless, under *Monsanto*, after the defendants have identified the basis of their motion, the plaintiffs must, in order to avoid summary judgment, present evidence which tends to exclude the possibility that the alleged conspirators acted independently.

The defendants have offered the affidavits of school officials from every school listed in plaintiffs' Complaint (Appendix to Defendants' Motion, Ex. 2a-s). The affidavits deny the allegations of restraint of trade as alleged in plaintiffs' Amended Complaint, paragraphs 6A through 6K. The defendants have also submitted deposition excerpts from each of the three named plaintiffs. The joint deposition of plaintiffs Holman and Pugh reveals that neither plaintiff has made any effort to become an official photographer (Appendix to Defendants' Motion, Ex. 12). Similarly, plaintiff Friedman testified in his deposition that he was able to gain the information necessary to submit a bid, but chose not to because he objected to paying a commission. (Appendix to Defendants' Motion, Ex. 14). Plaintiff Larry LeMasters testified that on more than one occasion he requested that school officials place him on the list of interested school photographers so that he could obtain the information necessary to submit a bid. (Appendix to Defendants' Motion, Ex. 13). Despite his efforts, LeMasters testified that he was never invited to submit a bid.

In response to defendants' Motion, the plaintiffs submitted affidavits which allege that "school officials" excluded them from the bidding process. (Friedman Aff. ¶ 2; LeMasters Aff. ¶ 2; Holman–Pugh Aff. ¶ 2). While the plaintiffs' affidavits are sufficient to counter defendants' evidence, the plaintiffs' evidence fails to implicate the defendants. The plaintiffs' affidavits do not allege, nor is there any evidence in the record to suggest, that there is any agreement, tacit or explicit, between the defendants and the schools to exclude the plaintiffs from the bidding process. Similarly, although the record suggests that various "school officials" have been uncooperative with the plaintiffs in supplying photograph specifications (Plaintiffs' Book III, Ex. 22–27; Friedman Aff. ¶ 3), there is no intimation that the defendants were involved in these activities. Finally, plaintiffs argue that they will proffer evidence of approximately 40 students and parents who will testify that they have experienced refusals, or threatened refusals, to publish plaintiffs' yearbook photographs. The plaintiffs' affidavits state, however, that these refusals were made by school officials. Again, there is no evidence to suggest that the school officials' actions were taken other than unilaterally.

The plaintiffs also argue that the letters sent by the schools and the defendants, which inform the students and parents that defendants are the "official" yearbook photographer, are evidence of a conspiracy. The Court disagrees. As discussed previously in this opinion, the letters disclose the commission payments and explain the contractual arrangement between the schools and the defendants. The letters, rather than being evidence of a conspiracy, are critical to avoiding a commercial bribery claim.

The plaintiffs next allege that a conspiracy exists because defendants are allowed to advertise in the yearbook free of charge, while plaintiffs are charged full price. In their brief, plaintiffs assert that Granby High School refused to publish a paid advertisement from Stephen Jay. Plaintiffs then argue that Norview High School, a school not under contract with defendants, accepted a Stephen Jay yearbook advertisement. (Plaintiffs' Book III, Ex. 54; Friedman Aff. ¶ 6). The Court notes, however, that the plaintiffs have not submitted evidence to support their claim that Granby High refused to publish plaintiffs' advertisement.[2] The affidavit of Ms. Anna Ma-

---

2. In support of their claim that Granby High refused to publish a paid advertisement, the plaintiffs cite Book III, Ex. 35. Exhibit 35 is a letter dated May 15, 1986 from Ms. Anna Marie Tarr, yearbook advisor at Granby High to plaintiff Friedman. The letter in its entirety states:

rie Tarr, yearbook advisor at Granby High School, states that Olan Mills has never discussed with officials at Granby the advertisements published in the yearbook. (Appendix to Defendants' Brief, Ex. 2Q ¶ 13). Assuming that plaintiffs could proffer evidence to support their claim that one high school rejected a noncontract photographer's advertisement, such circumstantial evidence does not reasonably tend to provide a "conscious commitment to a common scheme" in light of the Tarr affidavit. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

Although there is evidence in the record to support plaintiffs' claim that the contract photographers are allowed to advertise for free in the yearbook, the Court finds that the free advertisements are merely a service provided to the defendants in exchange for the commission payments. (Blancett Dep. at 22). Similarly, the defendants providing senior composites and faculty photographs are part and parcel of the contractual arrangement wherein defendants are endorsed by the schools as the "official photographer."

The plaintiffs also allege that defendants join with school officials in charging penalty fees to students who chose to have their photos taken by noncontract photographers. In support of this allegation, plaintiffs cite letters which are sent by the defendants and schools to the students (Plaintiffs' Book III, Ex. 19, 20, 76 and 77) and the plaintiffs' affidavits. The letters inform the students that if they elect to have their pictures taken by a noncontract photographer, a $4.00 charge will be assessed to cover the cost of publishing. The defendants in their reply brief submitted the deposition excerpt of E.C. Welsch. (Defendants' Reply Brief, Ex. G). Mr. Welsch testified that the $4.00 fee is automatically charged by the yearbook company for each photograph taken by a noncontract photographer. The affidavits of two school officials corroborate Mr. Welsch's

testimony that the processing fee is charged by the publishing company. (Appendix to Defendants' Brief, Ex. 2a and 2d). Thus, the plaintiffs' evidence in opposition to defendants' Motion does not establish concerted action by the defendants and the schools.

The Court finds that many of the acts which plaintiffs characterize as conspiratorial are merely the *quid pro quo* for the "official" photographer contracts used in this case. A schools endorsement of a defendant as an "official" photographer, and the schools' encouraging students and parents to patronize the official photographer are not evidence of an unlawful conspiracy. Even if school officials, in an effort to promote the official photographer, denied noncontract photographers access to the bidding procedure, refused noncontract photographs, or otherwise sought to exclude other competitors, this would not constitute conspiratorial conduct absent direct or circumstantial evidence that the defendants have encouraged or participated in such conduct.

The Court further finds that evidence of a conspiracy under Section 1 cannot be implied simply because the alleged conspirators have entered into a legitimate contract. In other words, the unlawful and unilateral conduct of one alleged conspirator cannot be imputed to the other alleged conspirator merely because the parties have entered into an otherwise lawful contractual agreement. The defendants' actions in signing the various contracts to become official school photographers are not evidence of a conscious commitment to deprive plaintiffs access to the relevant market, absent direct or circumstantial evidence of a collateral agreement, tacit or express, to engage in unlawful conduct. The plaintiffs in this case have failed to produce evidence, in response to defendants' Motion, which tends to exclude the

"We are in the process of compiling specifications for yearbook senior photos. We will relay them to you as soon as possible." Book III, Exhibit 36 is a letter dated May 23, 1986 from Ms. Tarr to plaintiff Friedman which states:

"Here is the list of specifications for the senior photos for the coming year." Neither of these letters appear to involve yearbook advertisements.

**948**

possibility that the schools acted independently.

Accordingly, plaintiffs' claims brought pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), and Section 59.1–9.5 of the Code of Virginia (Count V) are DISMISSED with prejudice.

*Sherman Act—Section 2*

 In Counts IV and VIII, plaintiffs allege monopolization, attempted monopolization and conspiracy to monopolize in violation of Section Two of the Sherman Act. The Amended Complaint alleges a shared monopoly between defendant Olan Mills and defendant Kinder–Care. (Tr. of Hearing Dec. 28, 1988 at 72). In paragraph 22 of the Amended Complaint, plaintiffs allege that the monopolization claims are a "foreseeable result of the aforesaid contracts, combinations and conspiracies." Thus, the plaintiffs contend that the defendants' acts, which constitute the alleged conspiracy in restraint of trade, also support their claims of monopolization.

Because the Court has already determined that defendants have not conspired in violation of Section 1, the plaintiffs' Section 2 claim must likewise fail. As the Fourth Circuit noted in *Rockingham*, "One who does not compete in a product market *or conspire with a competitor* cannot be held liable as a monopolist in the market." *Rockingham*, 820 F.2d at 104 (emphasis added). Similarly, an attempt to monopolize requires proof of specific intent to monopolize and that the defendants employed methods, means and practices which would accomplish monopolization. *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Finally, the failure to establish a combination or conspiracy will defeat a claim that the defendants conspired to monopolize in violation of Section 2. ABA Antitrust Section, *Antitrust Law Developments* at 145 (2d ed. 1984). Accordingly, the plaintiffs' failure to establish a conspiracy or agreement between the defendants necessitates the dismissal of their monopolization claims brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count IV), and

Section 59.1–9.6 of the Code of Virginia are DISMISSED with prejudice.

Accordingly, defendant Olan Mills' and defendant Kinder–Care's Motion for Summary Judgment is GRANTED. This action is DISMISSED with prejudice.

IT IS SO ORDERED.